**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

RUSSEL WILLIAM BURKET,
Petitioner-Appellant,

v.

No. 99-7

RONALD ANGELONE, Director,
Virginia Department of Corrections,
Respondent-Appellee.

Appeal from the United States District Court
for the Eastern District of Virginia, at Norfolk.
Raymond A. Jackson, District Judge.
(CA-97-235-2)

Argued: November 30, 1999

Decided: March 27, 2000

Before LUTTIG and MOTZ, Circuit Judges,
and HAMILTON, Senior Circuit Judge.

_____

Dismissed by published opinion. Senior Judge Hamilton wrote the
opinion, in which Judge Luttig and Judge Motz joined.

_____

**COUNSEL**

**ARGUED:** Mark Evan Olive, THE LAW OFFICES OF MARK E.
OLIVE, P.A., Tallahassee, Florida, for Appellant. Robert Quentin
Harris, OFFICE OF THE ATTORNEY GENERAL, Richmond, Vir-
ginia, for Appellee. **ON BRIEF:** Timothy P. Schardl, THE LAW
OFFICES OF MARK E. OLIVE, P.A., Tallahassee, Florida; Andrew

A. Protogyrou, KNIGHT, DUDLEY, CLARK & DOLPH, Norfolk, Virginia, for Appellant. Mark L. Earley, Attorney General of Virginia, Robert H. Anderson, III, Assistant Attorney General, OFFICE OF THE ATTORNEY GENERAL, Richmond, Virginia, for Appellee.

_____

**OPINION**

HAMILTON, Senior Circuit Judge:

On January 19, 1994, in the Circuit Court for Virginia Beach, Virginia, Russel William Burket (Burket) pled guilty to, <u>inter alia</u>, capital murder, <u>see</u> Va. Code Ann. § 18.2-31. For that crime, the state trial court sentenced him to death. After exhausting his state remedies, Burket filed a petition for writ of habeas corpus, <u>see</u> 28 U.S.C. § 2254,[1] in the United States District Court for the Eastern District of Virginia, which the district court dismissed.[2] Burket appeals. Because Burket has failed to make a substantial showing of the denial of a constitutional right, <u>see id.</u> § 2253(c)(2), we deny his application for a certificate of appealability and dismiss the appeal.

_____

[1] Burket named Ronald Angelone, Director of the Virginia Department of Corrections, as Respondent. For ease of reference, we will refer to Respondent as "the Commonwealth" throughout this opinion.

[2] Because Burket's petition for writ of habeas corpus was filed after the April 24, 1996 enactment of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214, the amendments to 28 U.S.C. § 2254 effected by section 104 of the AEDPA govern the resolution of this appeal. <u>See Mueller v. Angelone</u>, 181 F.3d 557, 565-69 (4th Cir.), <u>cert. denied</u>, 120 S. Ct. 37 (1999); <u>Green v. French</u>, 143 F.3d 865, 868 (4th Cir. 1998), <u>cert. denied</u>, 119 S. Ct. 844 (1999); <u>see also Lindh v. Murphy</u>, 521 U.S. 320, 336 (1997) (holding that habeas petitions filed prior to the effective date of the AEDPA are not governed by the Chapter 153 AEDPA amendments). The Commonwealth does not maintain that the provisions of section 107 of the AEDPA (including the more stringent procedural default provisions) apply.

I

A

As found by the Virginia Supreme Court on direct appeal, the facts of this case are as follows:

On January 14, 1993, about 2:00 p.m., Terry Cain placed a telephone call to Barbara Pullman, who is Katherine Tafelski's mother. Cain informed Pullman that Cain's three-year old daughter, Chelsea Brothers, had spent the night with Katherine Tafelski and her children. Mrs. Tafelski had agreed to take Chelsea to school on the morning of January 14, but had failed to do so. Pullman placed a telephone call to her daughter's home, but she received an answering machine recording, "which was not normal." Pullman decided to go to her daughter's residence to ascertain why she had not taken Chelsea to school.

When Pullman arrived at her daughter's home, she was unable to gain entry because the front door was locked. Joan Poillon, who lived in the neighborhood, began to help Pullman gain access to the residence. As they tried to enter the front door, they heard Chelsea crying. Chelsea was inside the home, but was unable to open the front door because of her age and diminutive stature.

Pullman and Poillon went to the rear of the house and discovered that the back door was open. When they entered the house, Chelsea ran to them crying. They observed that Chelsea had suffered a facial injury.

Pullman and Poillon began to search the house in an attempt to locate Katherine Tafelski; her daughter, Ashley Tafelski, age five; and her son, Andrew J. Tafelski, Jr., age three. Pullman and Poillon found Katherine Tafelski's partially nude body, covered in blood, lying on her bed. It was apparent that she had been struck numerous times in the head and sexually assaulted with some type of object. The white

3

sweatshirt that she had been wearing was ripped in several places and soaked with blood.

Pullman ran to the kitchen area of the residence and placed a telephone call to the police. Poillon continued to search for the children. Poillon entered Ashley Tafelski's bedroom, and discovered Ashley's body lying in her bed with her hand hanging over the side of the bed and a large pool of blood beneath her. It appeared that Ashley had been struck several times in the head with a hard object. A small piece of bone fragment, "coupled with hair and blood," was near the foot of Ashley's bed.

Poillon found Andrew Tafelski, Jr., in his bedroom, lying in the top bunk bed. He was suffering from numerous head and facial injuries, but he was still conscious.

After the police arrived at the residence, Detective Shawn Hoffman and another officer conducted a search of the area surrounding the residence. A trained dog located a track that extended from the rear utility room of the house to a wooded area behind the home. An officer found an old double-barrel shotgun in the woods. The shotgun had been removed from the Tafelski's [sic] residence.

The intruder's apparent point of entry was a door located in the back of the Tafelskis' residence. The door contained numerous fresh tool marks. These tool marks were of a similar pattern and shape as marks found on the bodies of Katherine and Ashley Tafelski.

The bodies of Katherine and Ashley Tafelski were taken to the Norfolk Crime Lab for autopsies and forensic examination. Dr. Leah Linda Elizabeth Bush, assistant chief medical examiner, performed the autopsies.

The autopsy of Katherine Tafelski's body revealed the following. Her head had been struck six or seven times with an object of significant weight. The skull was completely

4

crushed, and it appeared that massive force had been applied.

She had marks on her right upper inner thigh that, upon observation, appeared to resemble a belt buckle. She had suffered vaginal and anal penetration by an inanimate object. The vaginal penetration was made with an object ranging in diameter from one-half to two inches and penetrating to a length of twenty-one inches. The object, later identified as an automotive tool[3] about thirty inches long and containing a "screwdriver tip," perforated the victim's posterior vaginal wall, the left iliac artery, the left iliopsoas muscle, the small bowel mesentery, the omentum, the stomach, the left posterior hemidiaphragm, and the left periaortic soft tissue with intimal and medial aortic transection. A gray substance with a greasy consistency was found at the entrance of the victim's anal cavity.

Dr. Bush found a small piece of "bark/wood" while examining the victim's internal organs. Four or five abrasions, two of which contained small lacerations, were present on the victim's right side. Dr. Bush noted that either the blunt force trauma to the victim's head or the injury to her vaginal area and its related perforations would have been sufficient to cause death.

The autopsy of Ashley Tafelski's body revealed the following. Ashley suffered massive head injuries that were inflicted by the same object that was used to kill her mother. She had four or five lacerations to her head. Two of the head wounds evidenced a "knurled" pattern on the skin. One of the wounds to Ashley's head did not break the skin, but crushed the skull underneath. Two of the wounds to Ashley's head evidenced markings consistent with the tool marks found at the point of entry at the residence. Dr. Bush determined that the cause of Ashley's death was blunt force trauma to her head.

_____

[3] The automotive tool is also described in the record as a "rusted metal pry bar."

Andrew Tafelski, Jr., suffered a double break in his jaw, at the joint and at the tip. He also had a wound above one of his eyes. Chelsea Brothers suffered bruises to her head, face, and body.

A blue washcloth was found in the room near Katherine Tafelski's body. Lynn S. Baird, a forensic scientist, examined the washcloth and determined that spermatozoa were present. Robert W. Scanlon, a forensic scientist, determined, by using DNA tests, that the spermatozoa found on the washcloth stain were consistent with Russel Burket's DNA profile. Approximately 7.8 percent of the Caucasian population possess the same HLA DQa type as found in the examined stain.

Chelsea Brothers told Officer M.C. Stewart that "the bad man had a gun and a dog." Chelsea stated, while being transported to the ambulance for treatment of her injuries, that she was afraid of "the dog, the big dog. There is a dog out there." Chelsea added that the dog was "out there on the house, on the roof." Burket and his parents, who live next door to the Tafelski residence, had several large dogs in their backyard that frequently peered over a privacy fence surrounding their property. Numerous police personnel observed these dogs sitting on the roofs of their pens.

As several officers began to search the Tafelski residence for physical evidence, they noticed that a man, later identified as Burket, looked at them for several minutes before entering his residence. This occurred several times. On one occasion, Burket began to walk toward two of the police officers, and he was advised to return to his home.

Later that day, Detective K.P. Rexroad spoke with Burket in his home. During this discussion, Burket said that he was frequently in Mrs. Tafelski's home to perform odd jobs for the family whenever her husband was out of town. Burket stated that he was outside of his residence around midnight on January 13, 1993, but that he had not seen anything unusual.

6

Burket v. Commonwealth, 450 S.E.2d 124, 126-28 (Va. 1994).

B

On July 6, 1993, a City of Virginia Beach grand jury returned two indictments against Burket. The first indictment charged Burket with statutory burglary, see Va. Code Ann. § 18.2-90; capital murder, that is, the willful, deliberate, and premeditated killing of Katherine and Ashley Tafelski during the same act or transaction, see id. § 18.2-31; and sexual penetration with an inanimate object, see id. § 18.2-67.2. In the other indictment, Burket was charged with two counts of malicious wounding, see id. § 18.2-51, one for the malicious wounding of Andrew Tafelski, Jr., the other for the malicious wounding of Chelsea Brothers.

On August 3, 1993, Burket moved to suppress his videotaped confession. On September 13 and 14, 1993, the state trial court held a hearing on Burket's motion. At the conclusion of the hearing, the state trial court denied the motion.

On January 19, 1994, Burket pled guilty to all counts, reserving the right to challenge on appeal the admissibility of his confession. At the plea hearing, the state trial court found that Burket's pleas of guilty were made voluntarily, intelligently, and knowingly.

At sentencing, the state trial court heard evidence in aggravation and mitigation of the capital murder count. Based on findings of Burket's future dangerousness and the vileness of the murders, the state trial court sentenced Burket to death on the capital murder count.[4]

On direct appeal, the Virginia Supreme Court affirmed Burket's convictions and sentences. See Burket v. Commonwealth, 450 S.E.2d at 135.[5] On April 3, 1995, the United States Supreme Court denied

_____

[4] The state trial court sentenced Burket to life on the statutory burglary and sexual penetration with an inanimate object counts, and to twenty years on each of the malicious wounding counts.
[5] On direct appeal, Burket raised the following claims: (1) his confession was inadmissible under Miranda v. Arizona , 384 U.S. 436 (1966),

7

Burket's petition for writ of certiorari. See Burket v. Virginia, 514 U.S. 1053 (1995).

On June 7, 1995, Paul Ray was appointed as counsel to represent Burket on state habeas. On August 30, 1995, Burket filed his state habeas petition in the Virginia Supreme Court.[6] On September 29, 1995, the Commonwealth moved to dismiss Burket's state habeas petition. In November 1995, Ray became seriously ill. Thereafter, Burket filed a motion requesting that an attorney from the Virginia Capital Representation Resource Center be appointed to represent him. On March 8, 1996, the Virginia Supreme Court granted the motion.

On July 19, 1996, Burket filed an amended state habeas petition. The amended petition alleged the following ten claims: (1) trial coun-

---

because he was "in custody" when he stated "I'm gonna need a lawyer" and the police failed to advise him of his Miranda rights; (2) his right to counsel was violated when he invoked his right to counsel by stating "I think I need a lawyer" and the police failed to cease the interrogation; (3) the police violated his Miranda rights when they continued to converse with him after he had been advised of his Miranda rights; (4) the state trial court erred in finding that his waiver of his Miranda rights was voluntary, knowing, and intelligent; (5) his rights under Miranda and Michigan v. Mosley, 423 U.S. 96 (1975), were violated when the police failed to cease the interrogation after he stated "I just don't think that I should say anything" and "I need somebody that I can talk to"; (6) the imposition of the death penalty violates the Cruel and Unusual Punishments Clause of the Eighth Amendment and the Due Process Clause of the Fourteenth Amendment; (7) his right to a jury trial was denied because he could not tell the jury how much time he would serve if given a life sentence; (8) the state trial court erred in finding the Commonwealth's expert witness, Dr. Paul Mansheim, more credible than his expert witnesses; (9) the state trial court failed to properly consider his mitigating evidence; and (10) the state trial court erred in allowing Andrew Tafelski, Sr., the husband of Katherine Tafelski and the father of Ashley and Andrew Tafelski, Jr., to testify during the penalty phase of his trial.

[6] The Virginia Supreme Court has exclusive original jurisdiction over habeas corpus petitions filed by prisoners "held under the sentence of death." Va. Code Ann. § 8.01-654(c)(1).

8

sel operated under several conflicts of interest in violation of Burket's Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendment rights; (2) trial counsel abdicated his role to investigate, prepare, and defend Burket in violation of Burket's Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendment rights; (3) Burket's guilty pleas were not knowingly, intelligently, and voluntarily made in violation of his Fifth, Sixth, Eighth, and Fourteenth Amendment rights; (4) the state trial court failed to inquire about Burket's competency and to conduct a competency hearing in violation of Burket's Fifth, Sixth, Eighth, and Fourteenth Amendment rights; (5) Burket was incompetent during all critical stages of his trial, and, therefore, his Fifth, Sixth, Eighth, and Fourteenth Amendment rights were violated; (6) the state trial court's refusal to suppress Burket's confession violated his rights under Miranda, and his Fifth, Sixth, Eighth, and Fourteenth Amendment rights; (7) Burket was deprived of effective assistance of counsel in violation of his Fifth, Sixth, Eighth, and Fourteenth Amendment rights; (8) trial counsel unreasonably utilized mental health experts; (9) Burket was deprived of his right to the effective assistance of competent mental health experts in violation of his Fifth, Sixth, Eighth, and Fourteenth Amendment rights; and (10) the prosecution engaged in various forms of misconduct, including the manner in which Burket's confession was obtained and the Commonwealth's introduction of expert testimony regarding Burket's future dangerousness, in violation of Burket's Fifth, Sixth, Eighth, and Fourteenth Amendment rights.

On August 26, 1996, the Commonwealth moved to dismiss Burket's amended state habeas petition. Numerous exhibits were attached to the Commonwealth's motion. On September 30, 1996, Burket filed a reply to the Commonwealth's motion to dismiss. Two affidavits were attached to Burket's reply. The first affidavit, six pages in length, was never executed by the affiant. This unexecuted affidavit apparently was drafted for Burket's father's signature. The unexecuted affidavit describes events concerning Burket's trial counsel's representation, Burket's guilty pleas, and Burket's mental competency at the time of his guilty pleas. The other affidavit, one page in length, was executed by the affiant, Susan Brown, a paralegal in the Virginia Capital Representation Resource Center. In her affidavit, Brown states that Burket's father, Lester Burket, Jr. (Lester, Jr.), told her that the facts set forth in his unexecuted affidavit were true, but

9

that Lester, Jr. did not want to sign the affidavit because "his wife read the affidavit and became very upset, that she thought it would hurt their son Lester, and that he did not want to do anything that would further upset her."

On October 4, 1996, Burket filed a motion to strike certain exhibits that were attached to the Commonwealth's motion to dismiss, or, in the alternative, for discovery and an evidentiary hearing. On October 8, 1996, the Commonwealth moved to strike the two affidavits attached to Burket's reply to the Commonwealth's motion to dismiss.

On November 20, 1996, in a two-paragraph order, the Virginia Supreme Court dismissed Burket's state habeas petition.**7** With respect to claims (1), (2), and (3), the Virginia Supreme Court dismissed them under the authority of <u>Anderson v. Warden</u>, 281 S.E.2d 885, 888 (Va. 1981) (holding that a petitioner is not permitted to challenge on state habeas the truth and accuracy of representations made by him as to the adequacy of his court-appointed counsel and the voluntariness of his guilty plea unless the petitioner offers a valid reason why he should be permitted to controvert his prior statements). With respect to claims (3), (4), (5), the portion of claim (6) challenging the voluntariness of Burket's confession, claim (9), and the portion of claim (10) challenging the voluntariness of Burket's confession, the Virginia Supreme Court dismissed them under the authority of <u>Slayton v. Parrigan</u>, 205 S.E.2d 680, 682 (Va. 1974) (holding that a claim that could have been raised at trial or on direct appeal, but was not, is not cognizable on state habeas). With respect to that portion of claim (6) that asserted a violation of <u>Miranda</u> and that portion of claim (10) that alleged prosecutorial misconduct in obtaining Burket's confession, the Virginia Supreme Court dismissed these claims under the authority of <u>Hawks v. Cox</u>, 175 S.E.2d 271, 274 (Va. 1970) (holding that a claim decided against the petitioner on direct appeal is not cognizable on state habeas). With respect to claims (7) and (8), the Virginia Supreme Court dismissed these claims on the basis that they lacked merit. With respect to the parties' motions to strike, the Vir-

_____

**7** On state habeas, no evidentiary hearing was provided. Sections 8.01-654(c)(1) & (2) of the Virginia Code permit an evidentiary hearing in the circuit court only by order of the Virginia Supreme Court, and then only on the issues enumerated in the order of the Virginia Supreme Court.

10

ginia Supreme Court granted the Commonwealth's motion and denied Burket's. Burket's petition for rehearing was denied by the Virginia Supreme Court on January 10, 1997.

On June 26, 1997, Burket filed a petition for writ of habeas corpus in the United States District Court for the Eastern District of Virginia. In his federal habeas petition, Burket asserted claims (1) through (10) of his amended state habeas petition and requested an evidentiary hearing.

On September 5, 1997, Burket filed a pro se motion to abandon further review of his death sentence and to schedule his execution. After receiving Burket's pro se motion of September 5, 1997, Burket's counsel conferred with Burket and advised the district court on September 24, 1997 that Burket did not want to withdraw his federal habeas petition. However, on October 24 and November 5, 1997, Burket filed pro se motions to withdraw his federal habeas petition and to schedule his execution.

On November 6, 1997, the district court held a hearing on Burket's motions to withdraw his federal habeas petition and to schedule his execution. At the hearing, Burket expressed his desire to withdraw his federal habeas petition and to be executed. After Burket testified, Burket's counsel questioned Burket's mental capacity to make the decision to withdraw his federal habeas petition. On November 13, 1997, Burket made yet another motion to withdraw his federal habeas petition and to schedule his execution.

On January 29, 1998, the district court appointed Dr. Paul Mansheim, the psychiatrist that testified for the Commonwealth at Burket's sentencing, to evaluate Burket and to prepare a report concerning whether Burket was competent to withdraw his federal habeas petition. On February 13, 1998, Dr. Mansheim attempted to meet with Burket and conduct a psychiatric evaluation of him. Burket refused on the ground that Dr. Mansheim had testified against him at his sentencing. Thereafter, on February 19, 1998, Burket filed a pro se motion to appoint another psychiatric expert to evaluate him. On March 5, 1998, the district court denied Burket's pro se motion to appoint another psychiatric expert to evaluate him, denied his pro se motions to withdraw his federal habeas petition and to schedule his

11

execution, and directed a United States Magistrate Judge to consider Burket's federal habeas petition and to issue a report and recommendation.

On July 7, 1998, the magistrate judge to whom the case was referred recommended that Burket's request for an evidentiary hearing be denied and his federal habeas petition be dismissed. On February 23, 1999, the district court agreed with the magistrate judge's report and recommendation; accordingly, the district court denied Burket's request for an evidentiary hearing and dismissed Burket's federal habeas petition. The district court entered its judgment the following day.

On March 9, 1999, Burket moved to set aside, or, in the alternative, to alter or amend, the district court's judgment. On April 12, 1999, the district court denied the motion and entered its judgment the following day. On May 11, 1999, Burket noted a timely appeal. On August 25, 1999, Burket filed a certificate of appealability in this court.

II

As noted earlier, because Burket filed his federal habeas petition after the effective date of the AEDPA, we review his claims under the AEDPA. See Mueller, 181 F.3d at 565-69; Green, 143 F.3d at 868; see also Lindh, 521 U.S. at 336. Under § 2254(d)(1), federal courts are prohibited from granting habeas relief on "any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim . . . resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." See Green, 143 F.3d at 868-76 (explaining application of § 2254(d)(1)).[8] Application of this standard requires a thorough review of the law

_____

[8] In October 1999, the Supreme Court heard argument in a case involving the proper interpretation of § 2254(d)(1). See Williams v. Taylor, No. 98-8384, 1999 WL 813784 (U.S. October 4, 1999) (transcript of argument). Although we apply § 2254(d)(1) as interpreted by Green in deciding this case, we note that we would reach the same result even if we were to apply the de novo standard of review to Burket's claims.

12

applicable to each claim in order to determine whether the decision of the state court was contrary to, or an unreasonable application of, that law. See, e.g., Sexton v. French , 163 F.3d 874, 880-89 (4th Cir. 1998), cert. denied, 120 S. Ct. 139 (1999).

A

Burket contends that his trial counsel, William McGraw (McGraw),**9** had a conflict of interest which rendered his representation constitutionally ineffective. The Virginia Supreme Court rejected this claim under the authority of Anderson, which holds that a petitioner is not permitted to challenge on state habeas the truth and accuracy of representations made by him as to the adequacy of his court-appointed counsel and the voluntariness of his guilty plea unless the petitioner offers a valid reason why he should be permitted to controvert his prior statements. See 281 S.E.2d at 888. The Virginia Supreme Court's application of Anderson brings into play the federal rules of procedural default.

Under the doctrine of procedural default, absent cause and prejudice or a miscarriage of justice,**10** a federal habeas court may not review constitutional claims when a state court has declined to consider their merits on the basis of an adequate and independent state procedural rule. See Harris v. Reed, 489 U.S. 255, 262 (1989). Such a rule is adequate if it is regularly or consistently applied by the state court, see Johnson v. Mississippi, 486 U.S. 578, 587 (1988), and is independent if it does not "depend[ ] on a federal constitutional ruling," Ake v. Oklahoma, 470 U.S. 68, 75 (1985).**11**

_____

**9** McGraw also served as Burket's counsel on direct appeal.
**10** Before this court, Burket has not attempted to establish that our refusal to address his procedurally defaulted claims would result in a "miscarriage of justice." Accordingly, we do not address the "miscarriage of justice" exception in this opinion.

**11** A distinct but related limit on the scope of federal habeas review is the doctrine of exhaustion. In the interest of giving the state courts the first opportunity to consider alleged constitutional errors occurring in a petitioner's trial and sentencing, the petitioner must exhaust all available state remedies before he can apply for federal habeas relief. See Mat-

13

Under federal habeas law, we are not at liberty to question a state court's application of a state procedural rule because a state court's finding of procedural default is not reviewable if the finding is based upon an adequate and independent state ground. See Harris, 489 U.S. at 262; Barnes v. Thompson, 58 F.3d 971, 974 n.2 (4th Cir. 1995). In Royal v. Taylor, 188 F.3d 239 (4th Cir.), cert. denied, 120 S. Ct. 465 (1999), we noted that we were "uncertain of the true scope of the Anderson rule and, consequently, whether it can be properly considered an adequate and independent state procedural rule." Royal, 188 F.3d at 248. In this case, we are equally uncertain as to the true scope of the Anderson rule, and, therefore, decline under the authority of Royal to apply it in this case. Accordingly, we address the merits of Burket's conflict of interest claim.

The Sixth Amendment provides in relevant part: "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. The Supreme Court has held that the Sixth Amendment guarantees to all criminal defendants the right to effective assistance of counsel. See Strickland v. Washington, 466 U.S. 668, 686 (1984). A necessary corollary to the right to effective assistance of counsel is the "right to representation that is free from conflicts of interest." Wood v. Georgia, 450 U.S. 261, 271 (1981); see also Cuyler v. Sullivan, 446 U.S. 335, 345-50 (1980).

In general, claims of ineffective assistance of counsel are covered by the familiar two-part test established in Strickland. Under that test, the petitioner first must show that his counsel's performance fell below an objective standard of reasonableness. See Strickland, 466

---

thews v. Evatt, 105 F.3d 907, 910-11 (4th Cir.), cert. denied, 118 S. Ct. 102 (1997); see also 28 U.S.C. § 2254(b). To exhaust state remedies, the petitioner must fairly present the substance of his claim to the state's highest court. See Matthews, 105 F.3d at 911. Thus, a procedural default occurs when the petitioner fails to exhaust available state remedies and "the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred." Coleman v. Thompson, 501 U.S. 722, 735 n.1 (1991).

14

U.S. at 687. Second, the petitioner must establish prejudice by showing "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694.

When an ineffective assistance of counsel claim is premised on an allegation that the petitioner's counsel labored under a conflict of interest, the Strickland inquiry is slightly different. The performance element of the Strickland inquiry is met when the petitioner establishes that his counsel was involved in an actual conflict of interest, as "[t]he effective performance of counsel requires meaningful compliance with the duty of loyalty and the duty to avoid conflicts of interest, and a breach of these basic duties can lead to ineffective representation." United States v. Tatum, 943 F.2d 370, 375 (4th Cir. 1991); see also Strickland, 466 U.S. at 692 (When burdened by a conflict of interest, counsel "breaches the duty of loyalty, perhaps the most basic of counsel's duties" and, therefore, fails to provide effective assistance of counsel.). With respect to the prejudice element, "[w]hen counsel for a defendant in a criminal case has an actual conflict of interest when representing the defendant and the conflict adversely affects counsel's performance in the defense of the defendant, prejudice to the defense is presumed," thus entitling the defendant to a new trial or sentencing. Tatum, 943 F.2d at 375; see also Strickland, 466 U.S. at 692; Cuyler, 446 U.S. at 348-50.

"The two requirements, an actual conflict of interest resulting in an adverse effect on counsel's performance, are often intertwined, making the factual analyses of them overlap." Tatum, 943 F.2d at 375. We have said that counsel has "an actual conflict when he actively represents conflicting interests." See id. Counsel's

> representation of conflicting interests, however, is not always as apparent as when he formally represents two parties who have hostile interests. He may harbor substantial personal interests which conflict with the clear objective of his representation of the client, or his continuing duty to former clients may interfere with his consideration of all facts and options for his current client. When the attorney is actively engaged in legal representation which requires him to account to two masters, an actual conflict exists when it

15

can be shown that he took action on behalf of one. The effect of his action of necessity will adversely affect the appropriate defense of the other. Moreover, an adverse effect may not always be revealed from a review of the affirmative actions taken. Rather, the failure to take actions that are clearly suggested from the circumstances can be as revealing. Thus, the failure of defense counsel to cross-examine a prosecution witness whose testimony is material or the failure to resist the presentation of arguably inadmissible evidence can be considered to be actual lapses in the defense. . . . Likewise, a failure to act on behalf of a client before trial has representational significance.

Id. at 376.

The gist of Burket's conflict of interest claim is that McGraw had a pre-existing ethical duty to his brother, Lester Burket, III (Lester, III), which conflicted with his duty to defend Burket.[12] According to Burket, McGraw's loyalty to Lester, III prevented him from pursuing evidence that would have implicated Lester, III in the Tafelski murders.

In support of his claim, Burket relies on the two affidavits that were stricken by the Virginia Supreme Court on state habeas. The first affidavit, six pages in length, was never executed by the affiant, Lester, Jr. The unexecuted affidavit describes events concerning McGraw's representation, Burket's guilty pleas, and Burket's mental competency at the time of his guilty pleas. Of particular note, the unexecuted affidavit states that: (1) McGraw did not ask Lester, Jr., Lester, III, or Burket to waive any conflict of interest; (2) Burket did not want to plead guilty; (3) Burket was going to tell the police that Lester, III committed the murders; (4) the deputies in the jail told Burket that they knew that Lester, III had committed the murders; (5) McGraw and Lester, Jr. discouraged Burket from accusing Lester, III; (6) Burket tried to fire McGraw, but McGraw and Lester, Jr. con-

_____

[12] McGraw represented Lester, III in a 1991 criminal case in which Lester, III pled guilty to attempted forcible sodomy. At the time Burket was arrested in connection with the Tafelski murders, Lester, III was on probation for this offense.

16

vinced Burket that the state trial court would not relieve McGraw as counsel; (7) Lester, Jr. could not explain Miranda to Burket; (8) McGraw did not investigate who should testify at the penalty phase of the trial; (9) Burket reported hallucinations in jail, was seeing his dog Rebel, and was seeing demons; and (10) Burket was confused, was not making any sense, and was unable to assist in his defense.

The other affidavit, one page in length, was executed by the affiant, Susan Brown, a paralegal in the Virginia Capital Representation Resource Center. In her affidavit, Brown states that Lester, Jr. told her that the facts set forth in his unexecuted affidavit were true, but that he did not want to sign the affidavit because "his wife read the affidavit and became very upset, that she thought it would hurt their son Lester, and that he did not want to do anything that would further upset her."

In federal habeas actions, we do not sit to review the admissibility of evidence under state law unless erroneous evidentiary rulings were so extreme as to result in a denial of a constitutionally fair proceeding. See Spencer v. Murray, 5 F.3d 758, 762 (4th Cir. 1993); see also Little v. Johnson, 162 F.3d 855, 862 (5th Cir. 1998), cert. denied, 119 S. Ct. 1768 (1999); Sellers v. Ward, 135 F.3d 1333, 1342 (10th Cir.), cert. denied, 119 S. Ct. 557 (1998); Clark v. Groose, 16 F.3d 960, 963 (8th Cir. 1994); Bueno v. Hallahan, 988 F.2d 86, 87 (9th Cir. 1993); Cooper v. Sowders, 837 F.2d 284, 286 (6th Cir. 1988).

In this case, the Virginia Supreme Court's decision to strike the two affidavits was not erroneous. We are aware of no authority under federal or Virginia law that permits the admission of an unexecuted affidavit, and Brown's affidavit is obviously inadmissible hearsay. Furthermore, even if the Virginia Supreme Court's evidentiary ruling was erroneous, the ruling was not so extreme as to result in the denial of a constitutionally fair proceeding. See Spencer, 5 F.3d at 762. Accordingly, we cannot consider these affidavits in our review of Burket's claims.

Based on the evidentiary record properly before us, we conclude that Burket has failed to establish that an actual conflict of interest adversely impacted on McGraw's performance. A review of that record, in particular the police's investigation and McGraw's perfor-

17

mance at trial, confirms that McGraw zealously defended Burket and pursued all available defenses and trial strategies which were of help to Burket.

From the beginning of the police's investigation, Burket was the main target of the investigation. On the day the bodies were discovered, January 14, 1993, several officers saw Burket look at them for several minutes on several occasions. On one occasion, Burket approached the officers, but was told to return to his residence. On that same day, Burket told the police that he was outside of his residence around midnight, but that he had not seen anything. Burket also told the police that he was frequently in the Tafelskis' residence performing odd jobs for the Tafelskis. Finally, the police determined that there had been a forced entry at the back door of the Tafelskis' residence. Near the door, a footprint was discovered, which later that evening, the police determined was Burket's.

In the days that followed, it became apparent that Burket was a more viable suspect than Lester, III. First, the police determined that the murders probably occurred between midnight and 6:00 a.m. However, Burket's parents told the police that Lester, III had gone to bed about 10:00 p.m. and had gone to work early the next morning. Second, the police determined that Lester, III apparently had never been in the Tafelskis' residence and had limited contact with the Tafelski family. Third, a search of Lester, III's place of employment revealed that no tools consistent with the length of the device used to commit the murders were found. Fourth, the police executed a search warrant at Burket's residence and recovered a pair of Burket's tennis shoes in which the soles had been tampered with. Thus, by the time the Burket brothers were questioned at police headquarters, all of the evidence, other than the fact that Lester, III was previously convicted of a sexual offense, pointed more toward Burket than to Lester, III.

On January 20, 1993, Burket's parents called McGraw and told him that Lester, III was in police custody. McGraw then went to the Virginia Beach Police Department to meet with Lester, III. At the police station, McGraw discovered that both Lester, III and Burket were being questioned about the Tafelski murders. The police refused McGraw's request to speak with the Burket brothers. Shortly thereafter, the Commonwealth's Attorney held a press conference announc-

18

ing that Burket had been arrested, had confessed, and that Lester, III had been released.[13] Following this announcement, Burket's parents hired McGraw to represent Burket. Burket's parents did not hire McGraw to represent Lester, III because McGraw was given assurances from the police that Lester, III was not a suspect.[14]

At the beginning of his representation, McGraw determined that Burket's mental health was an issue. McGraw retained two clinical psychologists, who reviewed approximately 1100 pages related to Burket's medical background since preschool. These medical experts did not opine that Burket was incompetent, either at present or at the time the offenses were committed, but did opine that Burket had certain intellectual and emotional limitations that could be used to create a case in mitigation.

The admissibility of Burket's confession was also a critical issue at trial. McGraw moved to suppress Burket's confession, raising numerous issues. McGraw vigorously challenged the admissibility of Burket's confession during a lengthy suppression hearing. Despite his efforts, the state trial court denied the motion. [15]

McGraw also had his investigator conduct an extensive pre-trial investigation. However, this lengthy investigation did not lead to exculpatory evidence or plausible defenses, including a defense implicating Lester, III.

_____

[13] Prior to his release, the police took hair and blood samples from Lester, III.

[14] Burket contends that Lester, III remained a suspect after his release. In support of this contention, he directs our attention to several forensic reports which list both Burket and Lester, III as"suspects." Burket's reliance on these forensic reports is misplaced. The forensic reports list only "suspects" and "victims" in referring to the person whose sample has been analyzed. Thus, Lester, III's designation as a"suspect" was routine and does not reflect whether the police viewed him as a suspect.

[15] Burket contends that McGraw's conflict of interest prevented him (McGraw) from calling Lester, III as a witness at the suppression hearing. We have reviewed this contention and reject it because we fail to see how Lester, III's testimony at the suppression hearing would have been of any help to Burket.

In the face of the Commonwealth's case against Burket, Burket, in consultation with McGraw, decided to plead guilty. McGraw and Burket agreed that Burket's best chance of avoiding the death penalty was to plead guilty and allow the state trial court to decide the issue of the appropriate penalty. Burket pled guilty, and the case proceeded to sentencing.

In preparation for sentencing, McGraw contacted numerous individuals, including Burket's friends, associates, and former teachers. In addition to the two mental health experts he hired, McGraw contacted numerous mental health professionals that had treated Burket over time.

At sentencing, Burket's mental health experts testified on his behalf. McGraw also vigorously cross-examined the Commonwealth's mental health expert. Every person willing to testify on behalf of Burket testified. This included members of Burket's hunting club, his parents, and a woman who testified to her willingness to allow Burket to watch her children.

Notwithstanding the evidence described above which conclusively demonstrates that McGraw did not have an actual conflict of interest, Burket insists that he has a viable conflict of interest claim. Reduced to its essence, Burket's conflict of interest claim rests on the contention that McGraw intentionally overlooked four critical pieces of evidence that allegedly implicated Lester, III in the Tafelski murders, thus creating a case of reasonable doubt for Burket. First, Burket contends that McGraw overlooked the fact that the blue washcloth found near Katherine Tafelski's body contained seminal fluid consistent with HLA DQa types of both him and his brother. Second, Burket contends that McGraw overlooked the facts that several casts of footprints found in the Tafelskis' yard were smaller than Burket's shoe size and Lester, III's shoe size is three sizes smaller than Burket's. Third, Burket contends that McGraw overlooked the facts that the murder weapon was a mechanic's tool and Lester, III was a master mechanic. Finally, Burket contends that McGraw overlooked the fact that Lester, III was previously convicted of a crime involving a sexual offense.

The flaw in Burket's argument is that this evidence would not have created a reasonable doubt as to Burket's guilt. That Burket and Les-

20

ter, III have similar HLA DQa types is of no particular import. Burket and Lester, III are brothers, and it is not unusual that brothers have similar HLA DQa types. Second, the fact that other footprints were found in the Tafelskis' yard is not surprising when one considers the fact that many police officers were around the Tafelskis' residence during the initial stages of the investigation. Third, the facts that the murder weapon was a mechanic's tool and Lester, III was a master mechanic are of no particular import because the record reflects that the Burkets had automotive tools in their residence and in their shed, and some of these tools were similar to the tools used to inflict the injuries to the victims. Finally, that Lester, III was previously convicted of a crime involving a sexual offense does not, when coupled with the evidence described above, create a reasonable doubt as to Burket's guilt. The Commonwealth's case against Burket was overwhelming. Burket gave a detailed confession concerning the crimes, and this confession was consistent with the forensic evidence developed by the investigative team. We have no doubt that the evidence Burket contends McGraw overlooked would not have created a reasonable doubt as to Burket's guilt.

This case does not involve Lester, III. Other than Burket's conclusory allegations, there is no evidence that suggests that Lester, III committed the murders in question, or that McGraw did not pursue available leads implicating Lester, III; none existed. Moreover, Burket not only confessed to the crimes, he later discussed his offenses and what motivated him with the Commonwealth's mental health expert. Thus, that Burket committed the murders was never in doubt. The outcome of the case turned on the admissibility of Burket's confession and his mental state. Thus, Burket's interests never diverged from Lester, III's. In short, Burket has failed to show that McGraw did not pursue a plausible defense strategy or tactic on account of an actual conflict of interest. Accordingly, we reject Burket's conflict of interest claim.

B

Burket contends that his guilty pleas were not made knowingly and voluntarily. On state habeas, the Virginia Supreme Court rejected this claim under the authority of Anderson, which holds that a petitioner is not permitted to challenge on state habeas the truth and accuracy

21

of representations made by him as to the adequacy of his court-appointed counsel and the voluntariness of his guilty plea unless the petitioner offers a valid reason why he should be permitted to controvert his prior statements. See 281 S.E.2d at 888. The Virginia Supreme Court also rejected this claim under the authority of Slayton, which holds that a claim that could have been raised at trial or on direct appeal, but was not, is not cognizable on state habeas. See 205 S.E.2d at 682. As we noted earlier, we are uncertain as to the true scope of the Anderson rule, and, therefore, decline under the authority of Royal to apply it in this case. However, the Virginia Supreme Court's rejection of this claim under Slayton brings back into play the federal rules of procedural default.

As we noted earlier, under the doctrine of procedural default, absent cause and actual prejudice or a miscarriage of justice, a federal habeas court may not review constitutional claims when a state court has declined to consider their merits on the basis of an adequate and independent state procedural rule. See Harris , 489 U.S. at 262. Such a rule is adequate if it is regularly or consistently applied by the state court, see Johnson, 486 U.S. at 587, and is independent if it does not "depend[ ] on a federal constitutional ruling," Ake, 470 U.S. at 75.

Burket does not dispute, nor could he, that Slayton is an independent and adequate state ground. Accordingly, we only can consider whether cause and prejudice exists to excuse the procedural default, not whether the state court correctly applied its own law. See Harris, 489 U.S. at 262.

Burket's cause argument is premised on the inadequacy of McGraw's performance at trial and on direct appeal. Burket claims that McGraw was constitutionally ineffective for failing to raise his guilty plea claim at trial and/on direct appeal. **16**

If attorney error amounts to constitutionally ineffective assistance of counsel under the standard established in Strickland, the Sixth

_____

**16** To the extent that Burket suggests that McGraw's alleged conflict of interest constitutes cause for his failure to raise this claim on direct appeal, we reject this argument. As explained earlier, McGraw did not operate under any conflict of interest.

22

Amendment dictates that the attorney's error must be imputed to the state. See Coleman, 501 U.S. at 754. Burket is constitutionally entitled to the effective assistance of counsel on direct appeal. See Evitts v. Lucey, 469 U.S. 387, 396 (1985). Accordingly, he may establish cause to excuse his procedural default by showing attorney error that satisfies the standard set forth in Strickland . See Coleman, 501 U.S. at 752-54.**17**

The Strickland ineffective assistance of counsel standard is somewhat different in the context of a guilty plea. In the context of a guilty plea, the petitioner must demonstrate that his trial counsel's performance fell below an objective standard of reasonableness and "that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." Hill v. Lockhart, 474 U.S. 52, 59 (1985).

With respect to McGraw's performance at trial, we must presume his conduct falls within the wide range of reasonable professional assistance. See Strickland, 466 U.S. at 688-89. We must be highly deferential in scrutinizing McGraw's performance and must filter the distorting effects of hindsight from our analysis. See id.; see also Bunch v. Thompson, 949 F.2d 1354, 1363 (4th Cir. 1991). With respect to McGraw's performance on direct appeal, we note that appellate counsel is given significant latitude to develop a strategy that may omit meritorious claims in order to avoid burying issues in a legal jungle. See Griffin v. Aiken, 775 F.2d 1226, 1235 (4th Cir. 1985). "[W]innowing out weaker arguments on appeal and focusing on those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy." Smith v. Murray, 477 U.S. 527, 536 (1986) (citation and internal quotation marks omitted). The standard is therefore not what later courts with the ben-

_____

**17** It is not clear whether the showing of prejudice required to excuse a procedural default is identical to the showing of prejudice required to establish ineffective assistance of counsel, namely, that "there is a reasonable probability that, but for [the errors], the result of the proceeding would have been different," Strickland, 466 U.S. at 694. See Williams v. French, 146 F.3d 203, 210 n.10 (4th Cir. 1998), cert. denied, 119 S. Ct. 1061 (1999). However, we need not decide this issue because Burket has satisfied neither standard in this case.

efit of hindsight believe should have been accomplished in earlier proceedings, but instead whether counsel at the time acted within the liberal bounds of competent representation.

Burket's ineffective assistance of counsel argument relies heavily on Lester, Jr.'s unexecuted affidavit which was stricken by the Virginia Supreme Court on state habeas. As we noted earlier, Burket cannot rely on this unexecuted affidavit in support of his claims. Thus, we must review his ineffective assistance of counsel argument in light of the remaining evidence in the record.

In this case, the state trial court conducted an extensive plea colloquy. In the colloquy, Burket acknowledged that he: (1) understood the charges against him; (2) discussed the charges and their elements with McGraw; (3) understood what the Commonwealth had to prove before he could be found guilty of the charges against him; (4) had enough time to discuss with McGraw any possible defenses; (5) decided for himself, after consulting with McGraw, to plead guilty; (6) was pleading guilty because he was in fact guilty of the crimes that he was charged with; (7) was, by pleading guilty, waiving his right to a jury trial, his right not to incriminate himself, his right to confront and cross-examine witnesses, and his right to defend himself; (8) had the right to appeal the denial of his motion to suppress and discussed this strategy with McGraw; (9) could be sentenced to death, two life terms, and forty years in prison; and (10) understood all of the state trial court's questions and answered them truthfully.

The state trial court also conducted an extensive colloquy with McGraw. During this colloquy, McGraw stated that he discussed with Burket the nature of the charges and their elements. He also stated that he discussed with Burket the consequences of his guilty pleas and his right to a jury trial. Based on Burket and McGraw's representations, the state trial court found that Burket "understands the nature of all of these charges, the consequences of his pleas and he's entered his pleas of guilty knowingly, intelligently, freely and voluntarily."

The standard for determining whether a guilty plea is constitutionally valid is whether the guilty plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant. See North Carolina v. Alford, 400 U.S. 25, 31 (1970). In

24

applying this standard, courts look to the totality of the circumstances surrounding the guilty plea, see id., granting the defendant's solemn declaration of guilt a presumption of truthfulness. See Henderson v. Morgan, 426 U.S. 637, 648 (1976) (plurality opinion).

We conclude that Burket has failed to meet either prong of the Strickland standard. With respect to the performance prong, in light of the overwhelming evidence of guilt, which included Burket's confession, forensic evidence linking him to the crime, the reports of the psychological experts indicating only a mild impairment, and McGraw's diligent efforts in pursuing available defenses, we cannot conclude that McGraw's conduct fell outside the wide range of reasonableness afforded attorneys under the Strickland standard when he recommended that Burket plead guilty.

With respect to the prejudice prong, Burket has not demonstrated that but for the assertedly ineffective assistance, a reasonable defendant would have insisted on proceeding to trial. See Hill, 474 U.S. at 59. Given the Commonwealth's powerful evidence against Burket, the circumstances of the crime, and the lack of available defenses, we conclude that, even absent McGraw's asserted errors, it is likely that a jury would have convicted Burket and that the state trial court would have given him the maximum sentence. We cannot conclude that a reasonable defendant in these circumstances would not have pled guilty.

Moreover, the record reflects that Burket's guilty pleas were voluntary and intelligent. The state trial court conducted an extensive colloquy with both Burket and McGraw to ensure that Burket's pleas of guilty were made knowingly and intelligently. Absent clear and convincing evidence to the contrary, Burket is bound by the representations he made during the plea colloquy. See Fields v. Attorney General of State of Maryland, 956 F.2d 1290, 1299 (4th Cir. 1992). Burket has presented no evidence of sufficient evidentiary force, e.g., evidence that he was forced, coerced, threatened, or improperly induced into pleading guilty, see Brady v. United States, 397 U.S. 742, 755 (1970) (holding that a guilty plea is made knowingly and intelligently if the defendant is fully aware of the direct consequences of his guilty plea and was not induced by threats[or promises to discontinue improper harassment], misrepresentation, including unful-

25

filled or unfulfillable promises, or by promises that are by their nature improper as having no relationship to the prosecutor's business, e.g., bribes), to demonstrate that his representations were untruthful or involuntary. Burket is, therefore, bound by his representations. See Fields, 956 F.2d at 1299.

In summary, McGraw's performance did not fall below an objective standard of reasonableness when he decided not to raise the voluntariness of Burket's guilty pleas at trial and/or on direct appeal; nor was Burket prejudiced by McGraw's decision not to raise this claim at trial and/or on direct appeal. Accordingly, Burket's guilty plea claim is procedurally defaulted.

C

Burket raises two related competency claims. First, he raises a procedural competency claim, contending that the state trial court was required to hold a competency hearing on its own initiative. In the alternative, Burket raises a substantive competency claim, contending that he was incompetent to stand trial. On state habeas, the Virginia Supreme Court held that these claims were procedurally defaulted under the authority of Slayton, which holds that a claim that could have been raised at trial or on direct appeal, but was not, is not cognizable on state habeas. See 205 S.E.2d at 682. Because Slayton is an independent and adequate state ground, we only can consider whether cause and prejudice exists to excuse the procedural default, not whether the state court correctly applied its own law. See Harris, 489 U.S. at 262.

Burket's cause argument is premised on his claim that McGraw was constitutionally ineffective for failing to raise his procedural and substantive competency claims at trial and/or on direct appeal.**18**

The Due Process Clause of the Fourteenth Amendment prohibits states from trying and convicting mentally incompetent defendants.

_____

**18** To the extent that Burket suggests that McGraw's alleged conflict of interest constitutes cause for his failure to raise Burket's competency claims on direct appeal, we reject this argument. As explained earlier, McGraw did not operate under any conflict of interest.

26

See Pate v. Robinson, 383 U.S. 375, 384-86 (1966). The test for deter-mining competence is whether "[a defendant] has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding . . . and whether he has a rational as well as a factual understanding of the proceedings against him." Dusky v. United States, 362 U.S. 402, 402 (1960). Competency claims can raise issues of both procedural and substantive due process.

For example, a petitioner may make a procedural competency claim by alleging that the trial court failed to hold a competency hear-ing after the defendant's mental competency was put in issue. To pre-vail, the petitioner must establish that the state trial court ignored facts raising a "bona fide doubt" regarding the petitioner's competency to stand trial. Pate, 383 U.S. at 384-86; see also Medina v. Singletary, 59 F.3d 1095, 1106 (11th Cir. 1995). Even if a petitioner is mentally competent at the beginning of the trial, the trial court must continually be alert for changes which would suggest that he is no longer compe-tent. See Drope v. Missouri, 420 U.S. 162, 180 (1975). Although there are "no fixed or immutable signs which invariably indicate the need for further inquiry to determine fitness to proceed," "evidence of a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence to stand trial are all relevant." Id.

On the other hand, a petitioner may make a substantive compe-tency claim by alleging that he was, in fact, tried and convicted while mentally incompetent. See Pate, 383 U.S. at 384-86; Dusky, 362 U.S. at 402. In contrast to a procedural competency claim, however, a peti-tioner raising a substantive claim of incompetency is entitled to no presumption of incompetency and must demonstrate his incompe-tency by a preponderance of the evidence. See Medina, 59 F.3d at 1106. "Not every manifestation of mental illness demonstrates incom-petence to stand trial; rather, the evidence must indicate a present inability to assist counsel or understand the charges." United States ex rel. Foster v. DeRobertis, 741 F.2d 1007, 1012 (7th Cir. 1985). Like-wise, neither low intelligence, mental deficiency, nor bizarre, volatile, and irrational behavior can be equated with mental incompetence to stand trial. See Medina, 59 F.3d at 1107. Moreover, the fact that the petitioner has been treated with anti-psychotic drugs does not per se render him incompetent to stand trial. Id.

27

McGraw's decision not to raise the two competency claims at trial and/or on direct appeal was an eminently reasonable decision; nor was Burket prejudiced by McGraw's decision not to raise these claims. In fact, a review of the record leads to the inescapable conclusion that there was never a bona fide doubt as to Burket's competency.

First, the circumstances surrounding Burket's confession suggest that he was competent to stand trial. A review of his confession reveals that Burket gave rational, responsive answers to the police's questions and was able to recall and describe events in detail. As the state trial court found, "[t]he defendant's demeanor [on the videotape] was that of an alert, composed, even knowledgeable individual." Burket v. Commonwealth, 450 S.E.2d at 132. Moreover, the Virginia Supreme Court on direct appeal found that Burket's waiver of his Miranda rights, the validity of which we discuss later, was "made knowingly, voluntarily, and intelligently." Id. at 133.

Second, throughout the trial proceedings, Burket acted in a manner exhibiting competence. For example, when Burket entered his guilty pleas, the state trial court conducted an extensive colloquy concerning the voluntariness and intelligence of his guilty pleas. Burket's replies were lucid and responsive. Burket repeatedly demonstrated his understanding of the charges and the trial proceedings. In particular, Burket recognized that even though he was pleading guilty, he was retaining his right to appeal the state trial court's ruling on the suppression motion. Burket stated: "I understand I can appeal the confession and nothing else." This statement reflects a sophisticated understanding of the proceeding.

Third, throughout the time leading up to Burket's guilty pleas, Burket acted normal and did nothing to lead McGraw or the state trial court to question his competency. See United States v. Caicedo, 937 F.2d 1227, 1232-33 (7th Cir. 1991) (that counsel did not raise competency issue was probative of fact that defendant was competent); United States v. West, 877 F.2d 281, 285 n.1 (4th Cir. 1989) (district court properly exercised discretion in denying competency motion of defendant whom it had observed and spoken with in many prior hearings). In particular, when Burket pled guilty, McGraw stated that he had explained the charges to Burket "in detail for almost a year now" and expressed confidence "that he today understands them and he has

28

for several months now." And, throughout the remainder of the trial, Burket did not express any uncertainty as to what was then occurring and did not act incoherently.

Fourth, neither of the defense's mental health experts nor the prosecution's mental health expert indicated that Burket was not competent to stand trial or assist in his defense. Burket's trial counsel retained the services of two mental health experts, Dr. Gary Hawk and Dr. Thomas Ryan, who testified on Burket's behalf in the penalty phase of the trial.

Dr. Ryan is a clinical psychologist specializing in neuropsychology. Dr. Ryan testified that he conducted neurological testing on Burket in November 1993. Based on his test results, Dr. Ryan testified that Burket had a mild cognitive impairment overall, but severe impairment in relation to learning functions, such as reading, writing, and simple calculation skills.[19]

Dr. Hawk, a clinical psychologist and the director of psychology at The Institute of Law, Psychiatry and Public Policy at the University of Virginia, testified that he met with Burket in March 1993 and, thereafter, in April 1993, and two more days in the following November. Dr. Hawk estimated that he saw Burket for about sixteen hours during those various meetings. Additionally, Dr. Hawk spoke on several occasions with Mr. and Mrs. Burket.

In December 1993, Dr. Hawk prepared a report of his evaluation of Burket. In his clinical summary, Dr. Hawk did not describe Burket as one who was incompetent to stand trial or unable to assist with his defense. Rather, he described Burket

> as a 25 year old individual with a significant history of depression and suicidal behavior. He was moderately depressed, and in the course of the present evaluation, reported disturbed sleep, dysphoric mood and suicidal ideation. There was some suggestion of perceptual abnormalities which were judged by the present evaluator to be of questionable validity. Neuropsychological examination revealed a pattern of mild cerebral dysfunction consistent

_____

[19] According to Dr. Ryan, in neuropsychology, an individual's cognitive functions are characterized as either above average, normal, mildly impaired, moderately impaired, or severely impaired.

29

with Mr. Burket's long standing history of verbal learning disability. Mr. Burket's history also suggested a chronic pattern of dependency, inadequate occupational and social behavior, and passive resistance to demands for more adequate performance. These features in sum suggest a substantial personality disorder, i.e., a long standing pattern of maladaptive personal and behavioral traits which have substantially impaired Mr. Burket's adult adjustment.

In addition, in his clinical summary, Dr. Hawk diagnosed Burket as suffering from dysthymia, a mood disorder. At the penalty phase of the trial, Dr. Hawk testified that dysthymia refers to a persistent chronic level of mild to moderate depression and involves a depressed or distraught mood over a period of time, appetite disturbance, sleep disturbance, low self-esteem, and suicidal ideas.

Furthermore, in his clinical summary, Dr. Hawk diagnosed Burket's personality as having features of two different personality disorders, dependence and passive aggressiveness. At the penalty phase of the trial, Dr. Hawk testified that Burket's dependence features included his "persistent inability to make decisions for himself, to take care of very basic life activities for himself, looking to others, relying on others to do things such as that for him, deferring his own considerations of himself often for considerations of others." According to Dr. Hawk, Burket's passive aggressive features included active resistance to the demands of adequate functioning.

In his report, Dr. Hawk recognized that several factors were potentially mitigating:

> Russell [sic] Burket is a young man whose life from early childhood has been marked by emotional disturbance and educational failure. The shame and stigma of his poor educational achievement, due to a severe learning disability, was sufficiently severe that a protracted hospitalization of several months was necessary in early adolescence to treat depression. As a young adult, he was hospitalized repeatedly after suicidal episodes. These incidents were precipitated by occupational failure, family conflict and personal despondency. As a young man, he was evaluated as so emotionally

30

and cognitively handicapped that he was unable to engage in employment and was awarded disability income. He has remained a dependant and unhappy young man, unable to perform many of the most simple activities of daily living that might allow for an independent existence. Activities as simple as reading street signs or negotiating relatively simple personal business represent a formidable challenge to him.

His recent existence prior to the alleged offense was relatively solitary and isolated, with his enthusiasm reserved for very few activities such as hunting. In spite of his difficulties, prior to the alleged offense, his adjustment evidenced an absence of antisocial activities such as substantial drug abuse, criminal activity or predatory violence. There is every indication that his long term adjustment to incarceration would be stable, however he would be at substantial risk for victimization by other inmates because of his passive and inadequate personality.

Like the testimony of Burket's mental health experts, the testimony of the Commonwealth's mental health expert, Dr. Paul Mansheim, does not indicate that Burket was incompetent to stand trial or unable to assist with his defense. Based on his review of Burket's history, the facts surrounding the offenses, and his evaluation of Burket, Dr. Mansheim testified that

[Burket is] a man whose had a long history of learning disability. He's had a great deal of frustration [about not] being able to accomplish very much with his life, and he's had a number of bad things happen to him in response to which he's acted out some--usually in a self destructive way.

Fifth, the state trial court made several findings at sentencing which belie any claim that Burket was incompetent at the time of the crimes or at trial, or was unable to assist with his defense. The state trial court found that Burket was not "insane, . . . mentally retarded, . . . or emotionally disturbed." The state trial court further found that Burket was "an articulate, knowledgeable, logical person. . . . You

31

have your limitations; but the court is aware or convinced that you are aware of what you did and what you do."

In summary, we have carefully reviewed the evidence pertaining to Burket's competency at the time of the offenses and at the time of his trial, including the transcripts of the suppression hearing, the guilty plea hearing, and the penalty phase of the trial. This record reflects that Burket suffered from some mild mental impairments during the course of his life. Nonetheless, the evidence in the record overwhelmingly suggests that there was never a bona fide doubt as to his competency to stand trial, and it follows, necessarily, that Burket was competent to stand trial. Consequently, McGraw's performance did not fall below an objective standard of reasonableness when he decided not to put Burket's competency in dispute at trial and/or on direct appeal; nor was Burket prejudiced by McGraw's decision not to raise these claims. Accordingly, Burket's competency claims are procedurally defaulted.

D

Burket lodges several attacks on the state trial court's decision to decline to suppress his confession. As found by the Virginia Supreme Court on direct appeal, the facts surrounding Burket's confession are as follows:

> On January 20, 1993, Detectives Shawn Hoffman and Robert Sager went to Burket's home about 2:00 p.m. Hoffman and Sager did not go to Burket's home to arrest him, but to interview Burket there or ask if he would accompany them to police headquarters for an interview. Detective Hoffman advised Burket and his mother, Ardyth Burket, that he would like Russel Burket to accompany Hoffman to the police headquarters to help with the investigation. Russel Burket stated that he "didn't have a problem with that." Hoffman advised Burket and his mother that Russel Burket was not under arrest and that he was "certainly free to leave at any time."

> Burket rode with Detective Hoffman and another detective to the police station in an unmarked police car. He was nei-

32

ther handcuffed nor restrained. There was no type of shield in the car. On the way to the police station, Hoffman and Burket stopped at a convenience store. The officers testified that they would have offered Burket a ride home had he changed his mind about participating in the interview.

The detectives and Burket arrived at the police headquarters at 2:30 p.m., and they went to an interview room. Hoffman closed the door to the interview room and informed Burket that he had done so to ensure their privacy. The detectives did not want the noise in the adjacent offices to interfere with the interview. Burket was not restrained or handcuffed in any way. The closed door was not locked. Hoffman advised Burket again that he was not under arrest and that he was free to leave at any time.

The interview commenced at 2:40 p.m. A video-audio tape was made of the interview. At 3:20 p.m., the detectives falsely informed Burket that the children inside the Tafelski home had seen him in the house on the night of the murders. Burket denied that he was in the house at any time on that night. At 3:22 p.m., the officers created another ruse by telling Burket that hair samples similar to his hair were found in the victims' residence. Then, Burket admitted that he had been in the victims' residence on the day of the murders.

At 3:24 p.m., Burket stated, "I'm gonna need a lawyer." The detectives immediately advised Burket that he was not under arrest and that he was free to leave at any time if he so desired. Burket continued to talk with the detectives, stating that on the night of the murders, he had entered the residence when he noticed the rear door had been broken. He stated that he walked in, observed the victims, and immediately left the house. Later, Burket said that he had lost control of his emotions and had accidentally killed the victims.

Burket stated at 3:36 p.m., "I think I need a lawyer." The detectives frisked Burket, placed him in custody, and Detective Sager advised Burket of his Miranda rights. Burket stated he understood his Miranda rights at that time.

33

Detective Hoffman reentered the interview room and began to illicit from Burket biographical data necessary for "booking" purposes. Burket initiated several questions to Detective Hoffman, which did not relate to personal information. Detective Hoffman once again informed Burket of his Miranda rights. Burket stated that he understood his rights, and he wanted to talk with Detective Hoffman. Burket continued to talk with the detectives, and he ultimately gave a detailed confession of the murders of Kathy and Ashley Tafelski and the assaults upon Andrew J. Tafelski, Jr., and Chelsea Brothers.

Burket v. Commonwealth, 450 S.E.2d at 128-29 (footnote omitted).

The state trial court denied Burket's motion to suppress, finding that

Burket was not in custody until the police officers asked him to stand and frisked him, therefore, his Miranda rights did not attach until that time; Burket understood his Miranda rights that the detective read to him and he was willing to talk with the police and the detectives were placed in a position of asking further questions because of Burket's persistence; and that Burket knowingly, intelligently, and voluntarily waived his constitutional privilege against self-incrimination and his right to counsel.

Id. at 129.

Burket contends his confession should have been suppressed because the police violated Miranda and some of its progeny. More specifically, Burket contends that: (1) his confession was inadmissible under Miranda because he was "in custody" when he stated "I'm gonna need a lawyer" and the police failed to advise him of his Miranda rights at that time; (2) his Miranda rights were violated when he invoked his right to counsel by stating "I think I need a lawyer" and the police failed to cease the interrogation; (3) the police violated his Miranda rights when they continued to converse with him after he had been advised of his Miranda rights; (4) the state trial court erred in finding that his waiver of his Miranda rights was volun-

34

tary, knowing, and intelligent; and (5) his rights under Miranda and Mosley were violated when the police failed to cease the interrogation after he stated "I just don't think that I should say anything" and "I need somebody that I can talk to." On state habeas, the Virginia Supreme Court dismissed these claims under the authority of Hawks, which holds that a claim decided against the petitioner on direct appeal is not cognizable on state habeas. See 175 S.E.2d at 274. Because these claims were decided on the merits on direct appeal, we shall review these claims under § 2254(d)(1).

1

Burket claims that his confession was inadmissible under Miranda because he was "in custody" when he stated "I'm gonna need a lawyer" and the police failed to advise him of his Miranda rights. On direct appeal, the Virginia Supreme Court rejected this claim, holding that Burket was not "in custody" under Miranda and its progeny, and, therefore, no Miranda warnings were required after Burket stated "I'm gonna need a lawyer." See Burket v. Commonwealth, 450 S.E.2d at 129-30.

In order to protect the right granted by the Fifth Amendment that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself," U.S. Const. amend. V, the Supreme Court in Miranda adopted prophylactic procedural rules that must be followed during custodial interrogations. See 384 U.S. at 444. The Court held that a suspect in custody "must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." Id. In general, any statements elicited from a suspect in violation of these rules are inadmissible in the prosecution's case-in-chief. See Stansbury v. California, 511 U.S. 318, 322 (1994) (per curiam). The procedural safeguards prescribed by Miranda only apply "where there has been such a restriction on a person's freedom as to render him `in custody.'" Oregon v. Mathiason, 429 U.S. 492, 495 (1977) (per curiam )). A person is "in custody" for purposes of Miranda if the person has been arrested or if his freedom of action has been curtailed to a degree associated with arrest. See Stansbury, 511 U.S. at 322. The proper perspective for determining whether a suspect is "in custody" at the time of questioning is

35

whether "a reasonable [person] in the suspect's position would have understood his situation . . . as the functional equivalent of formal arrest." Berkemer v. McCarty, 468 U.S. 420, 442 (1984).

Applying these principles, it is clear that Burket was not "in custody" at the time he said "I'm gonna need a lawyer." Burket voluntarily went to the police station upon request. Prior to the interview, Burket was advised that he was not under arrest and free to leave at any time. And after Burket said, "I'm gonna need a lawyer," Detective Hoffman again informed Burket that he was not under arrest and free to leave. In light of these facts, Burket was not entitled to Miranda warnings after he stated "I'm gonna need a lawyer." See California v. Beheler, 463 U.S. 1121, 1125 (1983) (holding that defendant was not "in custody" for purposes of Miranda even though the police questioned him in the station house and considered him the main suspect); Mathiason, 429 U.S. at 495 (holding that defendant was not entitled to Miranda warnings because he went to the police station voluntarily, was informed that he was not under arrest, and left the station after police questioning). Accordingly, the Virginia Supreme Court's rejection of this claim was not contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States.

2

Burket also contends that his Miranda rights were violated when he invoked his right to counsel by stating "I think I need a lawyer" and the police failed to cease the interrogation at that point. On direct appeal, the Virginia Supreme Court rejected this claim, holding that Burket's Miranda rights were not violated because no Miranda warnings were required until the police officers searched him and placed him under arrest, and Burket's statement "I think I need a lawyer" occurred before he was searched and placed under arrest. See Burket v. Commonwealth, 450 S.E.2d at 131.

For two independent reasons, Burket's claim fails. First, Burket's claim fails because he was not "in custody" at the time he stated "I think I need a lawyer." As noted above, a person is "in custody" for purposes of Miranda if the person has been arrested or if his freedom of action has been curtailed to a degree associated with arrest. See

36

Stansbury, 511 U.S. at 322. At the time Burket stated "I think I need a lawyer," he was neither arrested, nor was his freedom of action curtailed to a degree associated with arrest. See Beheler, 463 U.S. at 1125; Mathiason, 429 U.S. at 495. Under such circumstances, Burket could not invoke the protections provided by Miranda. See United States v. Wyatt, 179 F.3d 532, 537 (7th Cir. 1999)("The Fifth Amendment right to counsel safeguarded by Miranda cannot be invoked when a suspect is not in custody."); United States v. Bautista, 145 F.3d 1140, 1147 (10th Cir.) ("Thus, in order to implicate the Miranda-Edwards right to counsel prophylaxis, both a custodial situation and official interrogation are required."), cert. denied, 119 S. Ct. 255 (1998).

Second, Burket's claim fails because, even if he was being subjected to a custodial interrogation at the time he stated "I think I need a lawyer," he did not invoke his right to counsel. Under Miranda, a suspect in custody who invokes his right to counsel cannot be subjected to further police interrogation until counsel is present or the suspect initiates further conversation. See Edwards v. Arizona, 451 U.S. 477, 484-85 (1981). However, to invoke the right to counsel and prevent further interrogation, a suspect must unambiguously request the assistance of counsel. See Davis v. United States, 512 U.S. 452, 458-60 (1994). In Davis, the defendant's statement "Maybe I should talk to a lawyer" did not invoke the right to counsel because the statement was not clear enough to alert a reasonable police officer that he was requesting an attorney. Id. at 458-62.

In this case, Burket said to the officers "I think I need a lawyer." This statement does not constitute an unequivocal request for counsel. In fact, Burket's statement is quite similar to the defendant's statement in Davis ("Maybe I should talk to a lawyer"), which the Supreme Court found ambiguous. Id.; see also Mueller, 181 F.3d at 573-74 (petitioner's question to officer, "Do you think I need an attorney here," did not constitute unambiguous request for counsel).

In summary, the Virginia Supreme Court's rejection of this claim was not contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States.

37

3

Burket also contends that his Miranda rights were violated when the officers continued to converse with him after he had been advised of his Miranda rights. On direct appeal, the Virginia Supreme Court rejected this claim, holding that Burket waived his Miranda rights when he indicated that he understood his Miranda rights and was willing to talk to the police. See Burket v. Commonwealth, 450 S.E.2d at 131.

To effectuate a waiver of one's Miranda rights, a suspect need not utter any particular words. See United States v. Frankson, 83 F.3d 79, 82 (4th Cir. 1996). The Supreme Court has explained that "[t]he question is not one of form, but rather whether the defendant in fact knowingly and voluntarily waived the rights delineated in the Miranda case." North Carolina v. Butler, 441 U.S. 369, 373 (1979). "Thus, a defendant's subsequent willingness to answer questions after acknowledging his Miranda rights is sufficient to constitute an implied waiver." Frankson, 83 F.3d at 82 (citation and internal quotation marks omitted).

In this case, Burket impliedly waived his Miranda rights. After Burket had been placed under arrest and advised of his Miranda rights, Detective Hoffman returned to the interview room to get Burket to fill out a booking form. At that point, Burket initiated a conversation with Detective Hoffman, and, once again, Burket was advised of his Miranda rights. Burket stated that he understood his rights and wanted to talk to Detective Hoffman. Even though Burket never said "I waive my Miranda rights" or filled out a waiver of rights form, his cooperation and desire to speak with Detective Hoffman, coupled with his acknowledgment that he understood his Miranda rights, constituted an implied waiver of his Miranda rights. See Frankson, 83 F.3d at 82. Accordingly, the Virginia Supreme Court's rejection of this claim was not contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States.

4

In a related claim, Burket argues that his waiver of his Miranda rights was not knowing, voluntary, and intelligent. The Virginia

38

Supreme Court rejected this claim on direct appeal, primarily relying on the findings of the state trial court, which the Virginia Supreme Court concluded were supported by substantial evidence. See Burket v. Commonwealth, 450 S.E.2d at 132-33. In rejecting Burket's claim that his waiver of his Miranda rights was not knowing, voluntary, and intelligent, the state trial court found:

> This defendant's demeanor was that of an alert, composed, even knowledgeable individual. There was nothing unusual about his behavior. He appeared to understand all the questions posed by the police officer. He responded appropriately. He never appeared confused or frightened. In fact as was commented on, it also struck me that the defendant's verbal ability was quite impressive--as I might add was his general knowledge of things legal. Two examples--he was the one who raised with Detective Sager that it was time for the rights. There was a statement somewhere in the transcript in which the defendant made a very knowledgeable statement about not trying to construct an alibi. Throughout this defendant appeared to be unintimidated, responsive; and in fact at times he actually negotiated with the police officers during the course of this interview. He never asked that the interview be stopped.

Burket v. Commonwealth, 450 S.E.2d at 132-33.

In order for a confession obtained during a custodial interrogation to be admissible, any waiver of one's Miranda rights must be voluntary, knowing, and intelligent. See Miranda, 384 U.S. at 479. A valid waiver depends upon the totality of the circumstances, including the background, experience, and conduct of the defendant. See Butler, 441 U.S. at 374-75. We have considered the totality of the circumstances surrounding Burket's confession and conclude that he validly waived his Miranda rights. Accordingly, the Virginia Supreme Court's rejection of this claim was not contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States.

5

Burket claims that his rights under Miranda and Mosley were violated when the police failed to cease the interrogation after he stated

39

"I just don't think that I should say anything" and "I need somebody that I can talk to." These statements were made after Burket twice was advised of his Miranda rights. According to Burket, through these statements, he invoked his right to remain silent. Burket further posits that because the officers did not scrupulously honor his right to remain silent, his confession should have been suppressed. On direct appeal, the Virginia Supreme Court rejected this claim, holding that Burket never invoked his right to remain silent. See Burket v. Commonwealth, 450 S.E.2d at 132.

In Mosley, the Supreme Court addressed an issue left open by Miranda--the circumstances, if any, under which resumption of questioning is permissible after a person in custody has indicated that he wishes to remain silent. See Mosley, 423 U.S. at 100-02. Rejecting an interpretation of Miranda that would "create a per se proscription of indefinite duration upon any further questioning by any police officer on any subject, once the person in custody has indicated a desire to remain silent," Mosley, 423 U.S. at 102-03, the Supreme Court concluded "that the admissibility of statements obtained after the person in custody has decided to remain silent depends under Miranda on whether his `right to cut off questioning' was `scrupulously honored,'" Mosley, 423 U.S. at 104.[20]

In this case, the police neither violated Miranda nor Mosley because Burket never invoked his right to remain silent. The Supreme Court has held that if a suspect "indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." Miranda, 384 U.S. at 473-74. In this case,

_____

[20] In Mosley, the Supreme Court set forth the following list of factors for a court to consider in making this inquiry: (1) whether the police had given the suspect Miranda warnings at the first interrogation and the suspect acknowledged that he understood the warnings; (2) whether the police immediately ceased the interrogation when the suspect indicated that he did not want to answer questions; (3) whether the police resumed questioning the suspect only after the passage of a significant period of time; (4) whether the police provided a fresh set of Miranda warnings before the second interrogation; and (5) whether the second interrogation was restricted to a crime that had not been a subject of the earlier interrogation. See Mosley, 423 U.S. at 104-07.

40

it is not clear that Burket wished to remain silent. Indeed, considering the circumstances as a whole, Detective Hoffman had every reason to believe that Burket wished to talk.

The Supreme Court's most recent exposition on ambiguous invocations was in the context of whether a suspect invoked his Sixth Amendment right to counsel. In Davis, the Court held that the determination of whether a suspect invoked his right to counsel is an objective one. See 512 U.S. at 459. The question is whether the suspect "articulate[d] his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." Id. Other circuits have held that this "objective inquiry" into ambiguity is applicable to invocations of the right to remain silent. See, e.g., Medina, 59 F.3d at 1100 (applying Davis's objective inquiry to determine whether suspect's invocation of the right to remain silent was ambiguous or equivocal); United States v. Banks, 78 F.3d 1190, 1197-98 (7th Cir.) (same), vacated on other grounds, 519 U.S. 990 (1996); cf. Barnes v. Johnson, 160 F.3d 218, 224-25 (5th Cir. 1998) (in light of Davis, trial court's admission of petitioner's fourth videotaped statement following his ambiguous statement invoking the right to remain silent was not contrary to clearly established federal law as determined by the Supreme Court), cert. denied, 119 S. Ct. 1768 (1999); United States v. Ramirez, 79 F.3d 298, 305 (2d Cir. 1996) (assuming, arguendo, that Davis applies to invocations of the right to remain silent, but not holding that it definitely does); United States v. Johnson, 56 F.3d 947, 955 (8th Cir. 1995) (citing Davis while determining whether right to remain silent had been invoked).

We have not determined whether Davis is applicable to invocations of the right to remain silent. However, because § 2254 is specifically focused on federal law as determined by the Supreme Court, we need not decide that issue here. See 28 U.S.C. § 2254(d)(1). We only need to decide whether the Virginia Supreme Court's decision to admit Burket's statement was contrary to clearly established federal law as determined by the Supreme Court. In light of the language and logic of the Supreme Court's decision in Davis, we cannot say that it was. Davis held that when faced with an ambiguous invocation of a right, an interrogator was not required to ask clarifying questions. See 512 U.S. at 461. In this case, Burket said to the officers "I just don't think

41

that I should say anything" and "I need somebody that I can talk to." These statements do not constitute an unequivocal request to remain silent. In fact, Burket's statements are quite similar to the defendant's statement in Davis ("Maybe I should talk to a lawyer"), which the Supreme Court found ambiguous. Id.; see also Mueller, 181 F.3d at 573-74 (petitioner's question to officer, "Do you think I need an attorney here," did not constitute unambiguous request for counsel). Accordingly, the Virginia Supreme Court's rejection of this claim was not contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States.[21]

III

For the reasons stated herein, we conclude that Burket has failed to make a substantial showing of the denial of a constitutional right with respect to each of his assertions of error. See 28 U.S.C. § 2253(c)(2).[22] Accordingly, we deny his request for a certificate of appealability and dismiss the appeal.

DISMISSED

_____

[21] Burket raises two additional claims attacking the validity of his confession. First, he claims that, under the totality of the circumstances, his confession violated his Fifth Amendment rights and his alleged mental illness vitiated his waiver of his Miranda rights. On state habeas, the Virginia Supreme Court held that this claim was barred under Slayton because it could have been raised at trial and/or on direct appeal. Because Burket has failed to establish cause for his failure to raise this claim at trial and/or on direct appeal and prejudice, the claim is procedurally defaulted. In the alternative, Burket claims that McGraw was constitutionally ineffective for failing to introduce mental health evidence in the suppression hearing. This claim was not raised in state court and, therefore, is procedurally defaulted. See Coleman, 501 U.S. at 735 n.1. In any event, we have reviewed both of these claims and find them to be without merit.

[22] We also conclude that Burket is not entitled to an evidentiary hearing on any of his claims.

42