**PUBLISHED**

# UNITED STATES COURT OF APPEALS
### FOR THE FOURTH CIRCUIT

PERCY LEVAR WALTON,
　　　　*Petitioner-Appellant,*

　　　　v.

RONALD J. ANGELONE,
　　　　*Respondent-Appellee.*

No. 02-18

Appeal from the United States District Court
for the Western District of Virginia, at Roanoke.
Samuel G. Wilson, Chief District Judge.
(CA-99-940-7)

Argued: December 5, 2002

Decided: February 27, 2003

Before WILKINS, Chief Judge, MOTZ, Circuit Judge, and
HAMILTON, Senior Circuit Judge.

Dismissed by published opinion. Senior Judge Hamilton wrote the
opinion, in which Chief Judge Wilkins and Judge Motz joined.

## COUNSEL

**ARGUED:** Michelle Jill Brace, VIRGINIA CAPITAL REPRESEN-
TATION RESOURCE CENTER, Charlottesville, Virginia, for
Appellant. Robert Quentin Harris, Assistant Attorney General,
OFFICE OF THE ATTORNEY GENERAL, Richmond, Virginia, for
Appellee. **ON BRIEF:** Jennifer L. Givens, VIRGINIA CAPITAL
REPRESENTATION RESOURCE CENTER, Charlottesville, Vir-

ginia, for Appellant. Jerry W. Kilgore, Attorney General, OFFICE OF
THE ATTORNEY GENERAL, Richmond, Virginia, for Appellee.

---

## OPINION

HAMILTON, Senior Circuit Judge:

On October 7, 1997, in the Circuit Court for the City of Danville,
Virginia, Percy Levar Walton pled guilty to four counts of capital
murder, Va. Code Ann. § 18.2-31, three counts of robbery, *id.* § 18.2-
58, one count of burglary, *id.* § 18.2-90, and six counts of using a fire-
arm in the commission of a felony, *id.* § 18.2-53.1. Following a sen-
tencing hearing in which the state trial court sat as the trier of fact,
the state trial court sentenced Walton to death on three of the capital
murder counts.[1] After exhausting his state remedies, Walton filed a
petition for writ of habeas corpus in the United States District Court
for the Eastern District of Virginia, 28 U.S.C. § 2254,[2] which, after
the case was transferred to the United States District Court for the
Western District of Virginia, the district court dismissed. Walton
seeks a certificate of appealability granting permission to appeal the
district court's order dismissing his petition for writ of habeas corpus.
Because Walton has failed to make a substantial showing of the
denial of a constitutional right, 28 U.S.C. § 2253(c)(2), we deny his
application for a certificate of appealability and dismiss the appeal.

I

A

As found by the Virginia Supreme Court on direct appeal, the facts
of this case are as follows:

---

[1]At the time of sentencing, one of the capital murder counts was dis-
missed by the state trial court.

[2]Walton named Ronald Angelone, Director of the Virginia Department
of Corrections, as respondent. For ease of reference, we will refer to
respondent as "the Commonwealth" throughout this opinion.

On November 16, 1996, Barbara K. Case, who was in Mississippi, made a telephone call to her parents, Elizabeth and Jessie Kendrick, who resided in Danville. Mrs. Case informed her parents during this telephone conversation that she planned to visit them during the approaching Thanksgiving holiday season. Mr. and Mrs. Kendrick agreed to meet their daughter at an airport in Greensboro, North Carolina, on November 25, 1996, three days before Thanksgiving, and return to Danville for the holidays. Mrs. Case made several attempts to reach her parents by telephone between November 16 and 25, 1996, but no one answered the telephone. Mrs. Case did not consider her parents' failure to answer the telephone unusual because her parents "traveled a lot."

When Mrs. Case arrived at the airport in Greensboro on November 25, 1996, her parents failed to meet her. She waited several hours, and then she became alarmed and disturbed. A woman at the airport gave Mrs. Case a ride to Danville.

When Mrs. Case arrived at her parents' home in Danville, their townhouse was dark, and their car was missing. Mrs. Case then went to her aunt's home, which is across the street from her parents' townhouse. Mrs. Case and her aunt went to the Kendricks' residence, but no one answered the door.

Mrs. Case spent the night of November 25, 1996, with her aunt, and she contacted the Danville Police Department the next morning. Several police officers arrived at Mr. and Mrs. Kendricks' townhouse and eventually entered the residence. The police officers found the body of Mr. Kendrick, lying face down on a living room floor. Mr. Kendrick's hands were "clasped, and above his head, clinched together." The police found the body of Mrs. Kendrick on the floor in the den. A portion of her body was covered with a sheet, and the upper portion of her body was wrapped in a "pinkish-orange material." Mrs. Kendrick's shirt had "been rolled up, and then taped" and was loosely tied around her neck with a slipknot. She had on undergarments below

her waist, her pants had been cut from her body, and her body had been dragged across the floor.

Mr. Kendrick, who was 80 years old at the time of his murder, had been shot in the top of the head at close range. He suffered a very large explosive type of wound where the bullet entered his head. A "star-shaped appearance" and the presence of soot on his head indicated that a muzzle of a gun was pressed tightly against the top of Mr. Kendrick's head when the gun was discharged and that gases emitted from the muzzle caused the skin around the entry point to "tear and rip." Mr. Kendrick also suffered superficial non-lethal cuts on the front of his neck and the palmar side of his left wrist.

Mrs. Kendrick, who was 81 years old at the time of her death, also suffered a tight contact gunshot wound to the top of her head. Her shirt, which was fashioned into a slipknot and tied around her neck, did not cause or contribute to her death.

The Kendricks were last seen alive on November 19, 1996, when Mrs. Kendrick, accompanied by her husband, went to a hospital in Danville. The police officers found the Kendricks' car a short distance behind their townhouse.

* * *

On November 28, 1996, Thanksgiving Day, Roxanne Moore, who was in Greensboro, North Carolina, placed a telephone call to the Danville Police Department. Ms. Moore informed the police personnel that her brother, Archie Moore, who lived at the Cabin Lake Apartment Complex in Danville, was supposed to have met her at an airport in Greensboro on November 27, 1996, but he failed to appear. Ms. Moore informed the police personnel that neither she nor her parents in North Carolina were able to contact Archie Moore by telephone at his Danville apartment.

Danville police officers entered Archie Moore's apartment around 8:00 a.m. on November 28. While searching the apartment, they found Archie Moore's body in a closet behind a suitcase. A plastic bag had been placed over Mr. Moore's head, and his feet were "propped up" against the closet wall. There was a strong odor of cologne in the closet and on the victim's body. The cause of Mr. Moore's death was a gunshot wound to his head, immediately above his left eye. A bullet was found on the floor in his apartment.

Shortly after Moore's body was discovered, two witnesses informed the Danville Police Department that they had recently observed Walton driving Moore's Ford Mustang automobile. Other witnesses had also observed Walton walking on a sidewalk from the area near Mr. and Mrs. Kendricks' townhouse toward Cabin Lake on several occasions between November 19 and November 26, 1996.

Subsequently, the police found Moore's Mustang, "parked right across the street from [Walton's] house." Walton lived in a condominium with his parents a short distance from Moore's apartment and the Kendricks' townhouse.

Lieutenant Kenneth D. Fitzgerald, a Danville police detective, went to Walton's home, spoke with Walton, and asked him if he knew Moore. Walton denied that he knew Moore, and he denied "ever [having] been in Archie Moore's car." Walton agreed to go to the police department for further questioning. Detective Fitzgerald left Walton's home and later, Walton, accompanied by his father, went to the police department.

The police obtained a search warrant for Walton's residence. During a search of Walton's bedroom, police personnel found a silver metal box inside one of Walton's boots. The box contained a diploma and an "ATM card," both bearing Archie Moore's name. The police also found a set of car keys; one key fit Moore's Mustang and two other keys fit locks on the doors of Moore's apartment. The police also found a ring, which contained a very distinctive letter

"A," which was similar to a ring that Moore had been wearing before his death.

When the police officers searched Moore's car, they found a box containing two dozen .32-caliber bullets as well as keys that fit locks in the Kendricks' car and home. The police officers also found a plastic bag which contained a "plastic sleeve" from a wallet. Jessie Kendrick's driver's license and his "Knights of Columbus" card were inside the "plastic sleeve." Walton's fingerprints were identified on the "plastic sleeve." Walton's fingerprints were also found on numerous items at various locations in Moore's apartment and car.

When the police searched the Kendricks' car, they found a shotgun that had been stolen from the Kendricks' townhouse. Walton's fingerprint was found on the shotgun. A knife, found in a toolbox in the trunk of the Kendricks' car, contained blood which matched Mr. Kendrick's DNA.

The police officers recovered two .32-caliber bullet cartridges that had been partially submerged near the shoreline of Cabin Lake. The lake was drained, and the police officers recovered a .32-caliber pistol that Mr. Kendrick had purchased in 1970. Ballistic tests conducted on a bullet that had been removed from Mr. Kendrick's head revealed that the bullet "matched" the .32-caliber pistol recovered from the lake and was consistent with the bullets that had killed Moore and Mrs. Kendrick. The pistol contained four bullets and two spent cartridges. The lead contained in the bullets found in Moore's car, the bullets recovered from the heads of the victims, and the bullets in the revolver originated from the same manufacturing source.

While in jail awaiting trial for the capital murder charges and related offenses, Walton admitted to several inmates that "he had killed three people at Cabin Lake." Walton also described the graphic details of the murders at length to Lacy H. Johnson, with whom Walton shared a cell in the Danville City Jail.

*Walton v. Commonwealth*, 501 S.E.2d 134, 136-38 (Va. 1998).

B

On March 3, 1997, a City of Danville grand jury charged Walton with the following offenses: (1) the capital murder of Archie Moore in the commission of a robbery while armed with a deadly weapon, Va. Code Ann. § 18.2-31(4); (2) the robbery of Moore, *id.* § 18.2-58; and (3) the use of a firearm during the commission of the capital murder of Moore, *id.* § 18.2-53.1. On August 28, 1997, the City of Danville grand jury returned another indictment charging Walton with the following eleven additional offenses: (1) the burglary of the Kendricks' home, *id.* § 18.2-90; (2) the capital murder of Elizabeth Kendrick in the commission of a robbery while armed with a deadly weapon, *id.* § 18.2-31(4); (3) the robbery of Elizabeth Kendrick, *id.* § 18.2-58; (4) the capital murder of Jessie Kendrick in the commission of a robbery while armed with a deadly weapon, *id.* § 18.2-31(4); (5) the robbery of Jessie Kendrick, *id.* § 18.2-58; (6) capital murder for the willful, deliberate, and premeditated killing of more than one person within a three-year period, *id.* §§ 18.2-31(4), (8); (7) the use of a firearm during the commission of the capital murder of Elizabeth Kendrick, *id.* § 18.2-53.1; (8) the use of a firearm during the commission of the robbery of Elizabeth Kendrick, *id.*; (9) the use of a firearm during the commission of the capital murder of Jessie Kendrick, *id.*; (10) the use of a firearm during the commission of the robbery of Jessie Kendrick, *id.*; and (11) the use of a firearm during the commission of the robbery of Moore, *id.*

On October 7, 1997, Walton pled guilty to all counts. At the plea hearing, the state trial court questioned Walton and found that Walton's guilty pleas were made voluntarily, intelligently, and knowingly.

At the separate sentencing hearing, the state trial court heard evidence in aggravation and mitigation of the capital murder counts. After considering the evidence and the arguments of counsel, the state trial court stated orally that Walton's conduct in each capital murder involved depravity of mind and that his conduct associated with each capital murder indicated that there is a probability that he will commit criminal acts of violence that would constitute a continuing serious

threat to society. However, the state trial court entered a sentencing order which did not mention depravity of mind, but stated that there is a probability that Walton would commit criminal acts of violence that would constitute a continuing serious threat to society. The state trial court fixed Walton's punishment at death for three of the capital murder counts and imposed three separate life sentences for each of the three robbery counts, ten years' imprisonment for the burglary count, and three years' imprisonment for each of the six firearms counts.[3]

On direct appeal, the Virginia Supreme Court affirmed the state trial court's judgment. *Walton v. Commonwealth*, 501 S.E.2d at 141.[4]

---

[3]At the sentencing hearing, the state trial court dismissed the capital murder count charging Walton with the willful, deliberate, and premeditated killing of more than one person within a three-year period.

[4]On direct appeal, Walton raised the following claims:

I. The Trial Court erred when it admitted the photographs of the victims as they were discovered at the crime scenes and of their autopsies over defense objections that such photographs were so prejudicial and inflammatory as to outweigh any probative value in violation of Walton's due process rights under the Fifth and Fourteenth Amendments of the United States Constitution.

II. The Trial Court erred in finding the stipulated evidence at the guilt phase sufficient to convict Walton, even on his pleas of guilty, in violation of his rights under the Fifth and Fourteenth Amendments to the United States Constitution.

III. The Trial Court erred in finding the Commonwealth's evidence sufficient to prove, beyond a reasonable doubt, the statutory aggravator of future dangerousness in violation of Walton's rights under the Fifth and Fourteenth Amendments of the United States Constitution, because, prior to these offenses, Walton had no prior history of significant violent offenses.

IV. The Trial Court erred in finding the Commonwealth's evidence sufficient to prove, beyond a reasonable doubt, the statutory aggravator of vileness, in violation of Walton's rights under the Fifth and Fourteenth Amendments of the United States Constitution because the facts of the offenses do not establish torture, depravity of mind or aggravated battery to the victims.

V. The sentence of death was under the influence of passion, prejudice or other arbitrary factor in violation of Walton's Eighth

With regard to Walton's challenge to the sufficiency of the evidence supporting the state trial court's finding of future dangerousness, the Virginia Supreme Court held

> that the facts and circumstances surrounding these murders are sufficient to support the trial court's finding of future dangerousness. Moreover, Walton's criminal history also supports the trial court's finding of future dangerousness. Walton had been convicted of statutory burglary and grand larceny. He had also been convicted of resisting arrest and assault and battery on a police officer. As a juvenile, Walton was convicted of two different offenses of possession of a firearm and one charge of assault and battery.

*Walton v. Commonwealth*, 501 S.E.2d at 139. On December 7, 1998, the United States Supreme Court denied Walton's petition for writ of certiorari. *Walton v. Virginia*, 525 U.S. 1046 (1998).

On February 5, 1999, Walton filed a state petition for writ of habeas corpus in the Virginia Supreme Court.[5] Because Walton's state habeas petition exceeded the court's fifty-page limit, on March 9, 1999, the Virginia Supreme Court ordered Walton to file a habeas petition not to exceed fifty pages. On March 30, 1999, Walton filed a fifty-page habeas petition.[6] Walton subsequently sought to add a

(Text continued on page 11)

---

> and Fourteenth Amendment rights under the United States Constitution.

> VI. The sentence of death is excessive or disproportionate to the penalty imposed in similar cases in violation of Walton's Eighth and Fourteenth Amendment rights under the United States Constitution.

[5]The Virginia Supreme Court has exclusive jurisdiction over habeas corpus petitions filed by prisoners "held under the sentence of death." Va. Code Ann. § 8.01-654(c)(1).

[6] Walton's March 1999 state habeas petition contained the following claims:

I.   Walton was incompetent to stand trial or plead guilty;

II.  The state trial court failed to employ adequate procedures to determine Walton's competency;

III.   Walton's guilty pleas were not knowing, intelligent, and voluntary;

IV.   Walton was not afforded appropriate expert assistance;

V.   Walton's rights under *Brady v. Maryland*, 373 U.S. 83 (1963), and *Kyles v. Whitley*, 514 U.S. 419 (1995), were violated;

VI.   Walton's rights under *Massiah v. United States*, 377 U.S. 201 (1964), were violated;

VII.   Walton's rights under *Napue v. Illinois*, 360 U.S. 264 (1959), were violated;

VIII.   Walton's counsel rendered ineffective assistance:

   (A)   Regarding Walton's mental health:

     1.   Counsel unreasonably failed to ensure that a proper competency evaluation was conducted;

     2.   Counsel unreasonably failed to ensure that a competency hearing was held;

     3.   Counsel unreasonably failed to ensure that a competency finding was made by the state trial court;

     4.   Counsel unreasonably failed to adequately investigate and present all information relevant to Walton's competency;

     5.   Counsel unreasonably failed to adequately investigate and present all necessary and relevant information regarding the knowing, voluntary, and intelligent nature of Walton's guilty plea and to ensure that the state trial court conducted a proper colloquy;

     6.   Counsel unreasonably failed to adequately investigate and present all necessary and relevant information regarding Walton's mental state at the time of the crime;

     7.   Counsel unreasonably failed to adequately investigate and present all necessary and relevant information regarding Walton's mental state during the sentencing phase;

claim under *Ford v. Wainwright*, 477 U.S. 399 (1986), that he is incompetent to be executed.[7]

The Virginia Supreme Court denied relief in a one-page unpublished order. Applying the rule in *Slayton v. Parrigan*, 205 S.E.2d 680 (Va. 1974) (claims not raised at trial and/or on direct appeal are not cognizable on state habeas), the Virginia Supreme Court refused to consider claims I, II, IV, V, VI, VII, and IX. Applying the rule in *Anderson v. Warden*, 281 S.E.2d 885 (Va. 1981) (an accused who enters a guilty plea is bound by his representations at trial), the Virginia Supreme Court refused to consider claims III, VIII(A) (except

8. Counsel unreasonably failed to ensure that Walton's rights to access to a psychiatrist under *Ake v. Oklahoma*, 470 U.S. 68 (1985), were appropriately asserted and afforded;

9. Counsel unreasonably failed to adequately advise Walton regarding his guilty plea; and

10. Counsel unreasonably failed to move to withdraw Walton's guilty pleas;

(B) In other respects at trial:

1. Counsel unreasonably failed to effectively cross-examine Lacy Johnson;

2. Counsel unreasonably failed to protect Walton's Sixth Amendment rights under *Massiah*;

3. Counsel unreasonably stipulated to evidence in the Commonwealth's proffer; and

4. Counsel unreasonably failed to object to the prosecutor's inappropriate re-direct examination of Lacy Johnson.

(C) On appeal.

IX. The death penalty is unconstitutional.

[7]Walton had raised a *Ford* claim as claim VIII in his oversized state habeas petition filed on February 5, 1999. When he filed his fifty-page state habeas petition on March 30, 1999, Walton abandoned the *Ford* claim.

for subpart 10), and VIII(B). The Virginia Supreme Court denied claims VIII(A)(10) and VIII(C) on the merits. The Virginia Supreme Court also denied Walton leave to add the *Ford* claim.

On September 8, 1999, Walton filed a petition for rehearing, accompanied by two affidavits and a neuropsychological evaluation, none of which previously had been proffered to the Virginia Supreme Court. On September 10, 1999, the Commonwealth filed a motion to strike the factual material attached to the petition for rehearing because it was untimely. On November 5, 1999, the Virginia Supreme Court granted the Commonwealth's motion to strike and denied Walton's petition for rehearing.

On November 19, 1999, the state trial court scheduled Walton's execution for December 16, 1999, pursuant to the provisions of Virginia Code § 53.1-232.1. On December 13, 1999, however, the United States District Court for the Eastern District of Virginia, without objection by the Commonwealth, stayed Walton's execution in order to allow him to file a federal habeas petition. On December 17, 1999, the case was transferred to the United States District Court for the Western District of Virginia.

Meanwhile, Walton sought review of the Virginia Supreme Court's denial of state habeas relief, asking the Supreme Court of the United States to determine whether Virginia's system of habeas corpus review as applied to death-row inmates such as Walton violates the Due Process Clause of the Fourteenth Amendment. The petition for certiorari was denied. *Walton v. Taylor*, 529 U.S. 1076 (2000).

On March 24, 2000, Walton filed a federal habeas petition. Walton's federal habeas petition contained the same claims as Walton's state petition, except claim IX was renumbered as claim X. As new claim IX, Walton alleged that he is incompetent to be executed.

On March 26, 2001, the district court ordered an evidentiary hearing on claim I and four subparts of claim VIII(A). At the hearing on May 16, 2001, however, the district court announced that it would hear evidence relating only to the performance prong of the four Sixth Amendment ineffective assistance of counsel claims. The district court indicated it would hear evidence on the substantive competency

claim and the prejudice prong of the ineffective assistance claims only if it first found deficient performance.

The district court issued its opinion on March 27, 2002. The district court held that all claims barred under *Slayton* were defaulted and that Walton failed to establish cause and/or prejudice to excuse those defaults. Relying on *Royal v. Taylor*, 188 F.3d 239 (4th Cir. 1999), and *Burket v. Angelone*, 208 F.3d 172 (4th Cir. 2000), the district court declined to give effect to the *Anderson* procedural bar. Consequently, it addressed claims III, VIII(A), and VIII(B) *de novo*, ultimately denying them on the merits. The district court further ruled that the Virginia Supreme Court's decision on claim VIII(C) was not contrary to or an unreasonable application of *Strickland v. Washington*, 466 U.S. 668 (1984). Finally, based on *Stewart v. Martinez-Villareal*, 523 U.S. 637 (1998), it dismissed claim IX without prejudice as premature.

On June 24, 2002, the district court denied Walton's motion for reconsideration. Walton noted his timely appeal to this court on July 22, 2002. Thereafter, Walton filed a timely application for a certificate of appealability.

## II

To be entitled to a certificate of appealability, a petitioner must make "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). In *Slack v. McDaniel*, the United States Supreme Court clarified § 2253's requirements. 529 U.S. 473, 483-84 (2000). To make the required showing, the petitioner must demonstrate that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Id.* at 484 (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)).

## A

Walton raises two claims related to his competency. The first is a substantive competency claim, which alleges that Walton was not

competent to plead guilty or stand trial. The second is an ineffective assistance of counsel claim, wherein Walton argues that his trial/appellate counsel, Lawrence Gott, was constitutionally ineffective for failing to raise the issue of competency before the state trial court and/or on direct appeal.

1

The facts relating to Walton's competency claims are as follows. After Walton was arrested on November 28, 1996, Gott, the Public Defender for the City of Danville since March 1990, was appointed as counsel for Walton.[8] Following his appointment, Gott obtained extensive background information about Walton, including information provided by family members and information provided by Walton in a thirty-nine page questionnaire. Walton denied any family history of mental illness or that he had ever been diagnosed or received any attention for psychological, mental, or emotional problems. Walton also denied experiencing symptoms of mental or emotional difficulties. In its opinion dismissing Walton's habeas petition, the district court found "no hint of irrationality in Walton's answers."

On January 30, 1997, Gott filed a "Motion for Expert Assistance" seeking appointment of a mental health expert pursuant to Virginia Code § 19.2-264.3:1 to assist the defense in the preparation and presentation of mitigation evidence. Less than one week later, the state trial court appointed Dr. Stanton E. Samenow, a licensed clinical psychologist.[9] The state trial court directed Dr. Samenow to submit a report to Gott concerning Walton's "history and character" and "mental condition at the time of the offense."

---

[8]Phyllis Mosby, another attorney with the Danville Public Defender's Office, was also appointed to assist Walton. However, Gott essentially was the lead counsel in the case.

[9]Dr. Samenow expressed in this case and in other cases a somewhat novel theory (in that it is not largely accepted by his colleagues) regarding mental illness and criminals. Although Gott was not pleased with Dr. Samenow's appointment, Gott and Samenow had a good working relationship.

In February 1997, Gott recorded several instances of strange behavior by Walton. For example, notes written by Gott's staff indicated that Walton did not appear at times to understand what his attorneys told him or that he just did not like what they were saying, and he sometimes displayed nervous laughter and drumming. In one conversation, Gott noted that Walton said he could not be seen if he closed his eyes and he described groups within the jail which he called "the mob" and the "one times" that he could move between with impunity. Walton once called Gott's office and told Gott's secretary that he was Percy Gunn (his father) and the "King of Hearts."[10] Walton also repeatedly told Gott that he wanted a bond hearing and a speedy trial at which his innocence would be proven.

Gott forwarded his notes concerning Walton's strange behavior, along with other information that he and his staff had collected about Walton, to Dr. Samenow, and informed Dr. Samenow about Walton's strange behavior. Dr. Samenow interviewed and evaluated Walton in Alexandria, Virginia on March 12-14, 1997, and later interviewed Walton and members of Walton's family in Danville on April 29, 1997.[11]

In July 1997, Walton indicated that he wanted to plead guilty because the "chair is for killers" and because he did not "want to make [a] bad name for [his] family." Walton expressed to Gott the belief that, if he was executed, he would be able to return to life

---

[10]During this time frame, Walton repeatedly telephoned the public defender's office demanding attention from the attorneys. On one occasion after Walton told the secretary that he was thinking about suicide, two attorneys showed up at the jail and found Walton in "good spirits" wanting a bond hearing. When asked about the suicide threat, "Walton said he just said it to say it."

[11]Dr. Samenow's August 22, 1997 report sets forth in detail Walton's upbringing. According to the report, Walton had a normal upbringing up until his teens when, according to his mother, his personality changed because he became involved with peers who used drugs and alcohol. Walton was expelled from school in the tenth grade because he had two different charges for possession of a firearm. Following his expulsion from school, Walton spent a month at Natural Bridge Juvenile Correctional Center. Because Walton created no problems and had no institutional offenses at the center, Dr. Samenow observed that Walton, in a "structured situation," was able to impress others.

immediately and resurrect other dead family members. Walton also acted out the murders in great detail in Gott's presence. Because Walton had admitted his guilt, Gott arranged to have Dr. Samenow see Walton again to evaluate him for sanity at the time of the offenses.

Dr. Samenow saw Walton again on July 11 and 14, 1997, and noted a marked change in Walton's "demeanor and mode of expression." Walton's behavior was "different" on Friday, July 11, 1997, and Dr. Samenow described Walton's speech as "run-on," "not responsive" to the subject of discussion, "unintelligible, at least to me," profane, and violent.

On Monday, July 14, 1997, Walton's behavior was "a mixture." Walton was "more responsive to very specific questions, but then he would again go off the track." For the first time, Walton related a belief he "read . . . in the Bible," that after he died he would "come back as a new person." Dr. Samenow described Walton's belief as coming back to life within "a day or something" of his execution with the same name, but with "a different spirit."[12]

Following his July interviews, Dr. Samenow sent a letter to the state trial court stating that Walton's mental state seemed to be "much different" than when he visited him earlier. According to Dr. Samenow, Walton seemed "less rational." Dr. Samenow wrote:

> This man articulated his thoughts in ways that I simply could not comprehend. Sometimes I could not understand his pressured flow of speech. At other times, I could understand the words, but the thoughts did not appear to be logical or coherent. He simply would go off on a tangent seemingly irrelevant to what we were discussing.

---

[12]Gott discussed Walton's post-execution beliefs with Dr. Samenow before trial, and Dr. Samenow did not voice any concerns to Gott about delusional behavior or about Walton's competence at that time. Specifically, Dr. Samenow told Gott that "somebody could have strongly held beliefs or opinions that may not be in the mainstream, but that didn't make them invalid for that person's perspective, and they could still be competent to proceed in a legal process."

Because of Walton's "apparent decompensation, and his reportedly being involved in fights in the detention center in Danville," Dr. Samenow considered Walton "imminently dangerous to himself and others" and he recommended that Walton "be placed in a secure psychiatric hospital where he can be observed for a further determination of his mental state and until he is no longer a danger to himself and others."

Gott immediately petitioned the state trial court to hospitalize Walton in a state "forensic mental health facility" under Virginia Code § 19.2-169.6(1) (authorizing a court to order that an incarcerated defendant receive emergency pre-trial hospitalization if the court finds by "clear and convincing evidence" that the defendant "is mentally ill and immediately dangerous to self or others in the opinion of a qualified mental health professional," and "requires treatment in a hospital rather than a jail in the opinion of a qualified mental health professional"). Although Gott requested that Dr. Samenow characterize Walton as mentally ill, Dr. Samenow refused because, at the time, Dr. Samenow could not diagnose Walton as mentally ill, but believed that hospitalization was the best option. Without a supporting diagnosis of mental illness, the state trial court declined to commit Walton to a hospital.

Approximately three weeks later, Gott moved for a competency evaluation, stating that there was "probable cause" to believe that Walton lacked "substantial capacity to understand the proceeding against him or to assist counsel in the preparation of his defense." Gott requested that the state trial court "direct the evaluation be done in-patient." Gott attached a copy of the letter Dr. Samenow had sent to the state trial court in July 1997. Gott viewed his motion as a "back door way to get him to a hospital."

On August 22, 1997, the state trial court ordered another evaluation by another mental health expert to determine Walton's "capacity to understand the proceedings against him and assist his attorney in his own defense" and to determine whether Walton "was affected by mental disease or defect" when he allegedly committed the murders. On the same day, Dr. Samenow prepared a report detailing his findings and conclusions.[13] The report, described by the district court as

---

[13]Dr. Samenow's conclusions were based on his interviews with Walton, tests he administered to Walton, including the Wechsler Adult Intel-

"drafted like a running commentary contemporaneous to the various evaluations," described some of Walton's strange behavior. Following a narration of the March and April 1997 interviews, Dr. Samenow stated that Walton was "competent to stand trial." According to Dr. Samenow:

> [Walton] understood that a capital murder charge can result in the death penalty "by electric chair or needle." He could identify his lawyers by name, knew their role, and he understood precisely what he was being charged with. He also knew that evidence is required to convict him. And he differentiated between what he thought he would be charged with and what he would not be charged with.

Moreover, Dr. Samenow noted that Walton stated that he had a strong case, a good lawyer, and believed he would be found not guilty.

However, on the final page of his report, Dr. Samenow stated that Walton, in July 1997, "was quite different in demeanor and mode of expression from the earlier interviews." Dr. Samenow was uncertain "what the dramatic change was attributable to." Dr. Samenow rhetorically stated that, "if Mr. Walton were to predicate his responses to his attorney upon a premise that death would bring him back to earth in a new and better form, would this not interfere with his being able to logically assist counsel in his own defense." Nevertheless, Dr. Samenow did not conclude that Walton was incompetent. At the federal evidentiary hearing, Dr. Samenow explained that, had he only interviewed Walton in July 1997, he would have concluded that Walton was not competent. However, he had also interviewed Walton in March and April 1997 and concluded then that Walton was compe-

---

ligence Test, the Bender-Gestalt Test, and the Thematic Apperception Test, interviews with Walton's mother, grandmother, maternal aunt, little league coach, principal, friend, paternal grandfather, paternal aunt, paternal stepmother, and a rehabilitation counselor who had counseled Walton, and a host of documents, including Walton's school records, records from the state trial court file, discovery provided by the Commonwealth, Walton's detention center records from an earlier detention, and the questionnaire Walton completed for Gott.

tent. Dr. Samenow explained that, because he had these two "snap-shots" of Walton, he only could call Walton's competency into question.

Pursuant to the state trial court's August 22, 1997 order, Dr. Miller Ryans, a board-certified psychiatrist specializing in forensic psychiatry, conducted a forensic evaluation of Walton on September 10, 1997. The evaluation was conducted in Dr. Ryans' private office without restraints. According to Dr. Ryans, Walton "was neat and clean in appearance, cooperative, friendly and presented no problems in communication." Walton was "alert," "oriented as to person, time and place," and "was able to give all data of personal identification and general information consistent with [a] high school student, with no evidence of psychosis, or extreme mood swings." Dr. Ryans did observe, however, that Walton falsely denied his guilt and that, "throughout the interview, . . . Walton would display an inappropriate laugh, which was not consistent with the material being discussed."

In his report to the state trial court, dated September 11, 1997, Dr. Ryans found that Walton was competent to stand trial. In reaching this conclusion, Dr. Ryans found that Walton had a satisfactory understanding of the proceedings against him and a "workable level of ability to assist in his own defense." Dr. Ryans further found that Walton, not only had an understanding of the charges against him, but also had an understanding of the roles of the judge, the jury, the Commonwealth's attorney, and the witnesses. Dr. Ryans sent a separate letter to Gott in which he noted that he found Walton "competent to plead and assist [Gott]."[14]

When Gott met with Walton on September 30, 1997, Walton was "loud" and refused to cooperate. Walton said that he wanted the "chair" but did not state specifically whether he wanted to plead guilty or not guilty. When Gott spoke with Walton the next morning, however, Walton was "calm and collected." After Gott explained the "time delays built into the system and the number of years it would

---

[14]At the federal evidentiary hearing, Dr. Ryans testified that Walton's unusual behavior with Dr. Samenow might have been attributable to malingering, the long-term effects of cocaine use, his limited intellectual functioning, and stress.

take before execution [Walton] still wanted to [plead guilty] and get 'the chair' and go out like a man." Walton signed a typed statement in which he professed to understand the charges against him as well as "all possible defenses" to those charges. In the statement, Walton made his wishes plain:

> My attorney has told me that he wants to try to negotiate (work out) a Life Sentence instead of a Death Sentence. I have told my attorney that I want to plead guilty and get a Death Sentence.

Walton signed a jury trial waiver form and a guilty plea questionnaire. Gott read the questions on the guilty plea questionnaire to Walton, recorded Walton's answers, and Walton signed the questionnaire.

On October 7, 1997, Walton pled guilty to all charges against him. The state trial court questioned Walton at length. Walton affirmed that he understood the charges against him, that his attorneys had explained what the Commonwealth must prove in order to convict him of those charges, that he had discussed any possible defenses that he might have, that he decided to plead guilty, that he was pleading guilty freely and voluntarily, that he was pleading guilty because he was, in fact, guilty, that he was waiving his right to trial by jury, that he was waiving his right not to incriminate himself, that he was waiving his right to confront and cross-examine his accusers, that he was waiving his right to defend himself, that no one had forced him to plead guilty or threatened him in any way, that no one had made any promises of any kind, that he understood that the court could impose multiple death sentences, that he was satisfied with the services of his attorneys, that his attorneys had gone over the guilty plea questionnaire with him in advance, that he understood all of the questions, and that he understood the state trial court's questions. Following the plea colloquy the state trial court found as follows:

> Let the record show, the Court has inquired of the defendant, Percy Levar Walton, as to his understanding of the nature of the charges against him . . . the freeness and voluntariness of his pleas of guilty to the charges . . . to his understanding of his waiver of his right to be tried by a jury

> . . . his waiver of his right to appeal decisions of this Court
> . . . as to his understanding of the limits of punishment,
> which might be imposed upon the convictions of these
> offenses. The Court hereby finds, as a matter of fact, that the
> defendant has tendered a plea of guilty to each of the
> charges . . . has done so freely, voluntarily, intelligently, and
> with a full knowledge and understanding of the conse-
> quences.

The state trial court then accepted Walton's guilty pleas.

Despite Walton's prior statements about wanting to be executed, he did not stop Gott from presenting arguments and a case for a life sentence. The state trial court conducted the sentencing phase of the case on October 29-31, 1997, allowing two days of evidence and a day for argument. Gott's sentencing phase strategy was to "accurately portray Walton as a young man who, although he had committed three murders, nevertheless had taken responsibility for his actions by pleading guilty and who, in the relatively recent past, had been such a good young man that upstanding citizens of the community were willing to speak on his behalf despite what he had done." In furtherance of this trial strategy, the defense called Walton's little league coach, some of his school teachers, two of his aunts, one of his former counselors at a juvenile correctional center, and his grandmother.[15] In general, these witnesses testified that Walton was a mild-mannered, polite, quiet, and respectful man. Walton's former counselor also testified as to Walton's progress and good behavior during Walton's short stay at Natural Bridge Juvenile Correctional Center. This latter evidence allowed Gott to argue to the state trial court that Walton responded well "to the treatment that was there offered to him at the time, so much so that his stay was relatively short."

For a couple of reasons, Gott chose this trial strategy over a mental illness strategy. First, "there was no available mental health evidence that would have been helpful and certainly none that would have

---

[15]According to Gott, he did not call Walton's mother to the stand because Walton was once charged with assaulting his mother and because Walton's mother recently had been charged and convicted of embezzlement.

made a difference." Second, through his numerous conversations with Walton's family members, Gott never received any information pertaining to any family history of mental illness. Third, Gott was "unaware of anything Dr. Ryans could have testified to that would have been helpful to Walton, and I certainly did not want to have Dr. Ryans cross-examined about Walton's false denials of guilt." Fourth, Gott did not like the idea of calling Dr. Samenow as a witness, not only because "his testimony generally would not have been helpful, but also because I knew from past experience in a capital case (*Calvin Swann*) that the prosecutor could elicit much adverse information from him on cross-examination." Fifth, Gott was aware that Walton had told at least two fellow inmates that he intended to "play crazy." Indeed, Walton, following his July 1997 interviews with Dr. Samenow, told a fellow inmate that he just went to Alexandria for a psychiatric evaluation and "played crazy all weekend." Finally, Gott was aware that, in March 1997, Walton had stood trial in Danville for burglary and grand larceny committed in September 1996 and that neither his competency to stand trial nor his sanity at the time of the offenses was an issue in that case. Indeed, Gott consulted with Walton's attorney in that case, who informed him that "Walton had done nothing but 'blow smoke,' i.e., lie to him, throughout his representation of Walton."

During the sentencing phase of the trial, Walton laughed, smiled, and waved to family members. Gott advised Walton to keep his head down or focus on a spot. During a victim impact statement made by one of the Kendrick grandchildren, the victim noted that she hoped the state trial court had noticed Walton's smiles and laughter over the course of the proceedings.

At the end of the second day of evidence, the Commonwealth presented as rebuttal evidence the testimony of two jail deputies who described some of Walton's violent conduct in jail. One of the rebuttal witnesses testified that Walton had stated that he wished he had killed his own mother.

After this rebuttal testimony, the state trial court took a brief recess. Gott met with Walton in the holding cell to discuss what would happen the next day and Walton became "very adamant and stubborn" about refusing to return to the courtroom. Dr. Samenow and Walton's

family tried to persuade Walton to return, but he adamantly refused to go back into the courtroom.

The state trial court asked Dr. Samenow to "do something," so Dr. Samenow met with Walton. Walton stated that he "had been disrespected" and simply refused to return. When all attempts failed, deputies maced Walton and returned him to the courtroom in shackles. The state trial court asked Dr. Samenow what Walton's behavior meant, and Dr. Samenow told the state trial court that Walton simply was scared, "He felt it was everything coming all at once finally, and he was scared." Dr. Samenow never expressed any concern about Walton's competence.

2

Walton contends that he was not competent to plead guilty or stand trial. More specifically, he argues that he lacked the capacity to understand the nature and purpose of the proceedings against him, to consult with counsel, and to assist in preparing his defense. Walton raised this claim in his state habeas petition. The Virginia Supreme Court dismissed this claim under *Slayton* because the claim could have been raised at trial and/or on direct appeal. In his federal habeas petition, Walton raised an identical incompetency claim and the district court held, following an evidentiary hearing, that this claim was defaulted under *Slayton* and went on to reject Walton's assertions of cause and prejudice.

As established in *Slack*, to secure a certificate of appealability on a claim that the district court denied pursuant to procedural grounds, Walton must demonstrate both (1) "that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right" and (2) "that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack*, 529 U.S. at 484. In conducting this two-prong test, we may proceed first "to resolve the issue whose answer is more apparent from the record and arguments." *Id.* at 485.

The Due Process Clause of the Fourteenth Amendment prohibits states from trying and convicting mentally incompetent defendants. *Pate v. Robinson*, 383 U.S. 375, 384-86 (1966). The test for determin-

ing competency is whether a defendant "has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding . . . and whether he has a rational as well as a factual understanding of the proceedings against him." *Dusky v. United States*, 362 U.S. 402, 402 (1960). Competency claims can raise issues of both procedural and substantive due process.

For example, a defendant may make a procedural competency claim by alleging that the trial court failed to hold a competency hearing after the defendant's mental competency was put in issue. To prevail, the defendant must establish that the trial court ignored facts raising a "bona fide doubt" regarding the defendant's competency to stand trial. *Pate*, 383 U.S. at 384-86. Even if a defendant is mentally competent at the beginning of the trial, the trial court must continually be alert for changes which would suggest that he is no longer competent. *Drope v. Missouri*, 420 U.S. 162, 180 (1975). Although there are "no fixed or immutable signs which invariably indicate the need for further inquiry to determine fitness to proceed," proof "of a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence to stand trial are all relevant." *Id.*

On the other hand, a defendant may make a substantive competency claim by alleging that he was, in fact, tried and convicted while mentally incompetent. *Pate*, 383 U.S. at 384-86; *Dusky*, 362 U.S. at 402. In contrast to a procedural competency claim, however, a defendant raising a substantive claim of incompetency is entitled to no presumption of incompetency and must demonstrate his incompetency by a preponderance of the evidence. *Burket*, 208 F.3d at 192. "'Not every manifestation of mental illness demonstrates incompetence to stand trial; rather, the evidence must indicate a present inability to assist counsel or understand the charges.'" *Id.* (quoting *United States ex rel. Foster v. DeRobertis*, 741 F.2d 1007, 1012 (7th Cir. 1984)). Similarly, "neither low intelligence, mental deficiency, nor bizarre, volatile, and irrational behavior can be equated with mental incompetence to stand trial." *Burket*, 208 F.3d at 192.

After carefully reviewing the record, we harbor no doubt that Walton was competent to appear in court and plead guilty on October 7, 1997 and at the sentencing phase of his case. First, throughout the trial proceedings, Walton "acted in a manner exhibiting competence."

*Id.* For example, prior to his pleas of guilty, Walton executed a two-page guilty plea questionnaire, which outlined the contours of his plea. At the plea hearing, the state trial court conducted an extensive colloquy with Walton concerning the voluntariness and intelligence of his guilty pleas. Walton's replies to the state trial court's questions were clear and responsive. Walton repeatedly demonstrated his understanding of the charges and the trial proceedings. Indeed, in the colloquy with the state trial court, Walton acknowledged that he had discussed his guilty pleas with his attorneys, that he understood the nature of the charges against him, that he had discussed the elements of each of the offenses with his attorneys, that his counsel had explained the elements of each of the offenses to him, that he was pleading guilty because he was, in fact, guilty, that he was waiving certain constitutional rights, and that he understood the possible sentences he could receive. His responses reflect "a sophisticated understanding of the proceeding." *Id.*

Second, although Walton's behavior in July 1997 and during a portion of the sentencing phase of the case was of concern to Gott and Dr. Samenow, neither Dr. Samenow nor Dr. Ryans indicated that Walton was incompetent. The thorough evaluations by the mental health experts provide powerful evidence that Walton was competent to appear in court and plead guilty on October 7, 1997 and at the sentencing phase of his case. *Id.* at 193-94 (that the petitioner and prosecution's mental health experts did not indicate that petitioner was incompetent was probative of the fact that petitioner was competent). Indeed, the potent strength of these thorough mental health evaluations understandably led Gott to decline to raise the issue of Walton's competency with the state trial court. *Id.* at 192-93 (that counsel did not raise the issue of competency provided powerful evidence that petitioner was competent).

In summary, we have carefully reviewed all of the evidence pertaining to Walton's competency at the time of his guilty pleas and at the sentencing phase of his case. The record reflects that Walton was competent at the time of his guilty pleas and at the sentencing phase of his case. Accordingly, because we cannot conclude that "reasonable jurists" would find the question of whether Walton was competent at the time of his guilty pleas and/or at the sentencing phase of the case "debatable," *Slack*, 529 U.S. at 484, we deny Walton's

request for a certificate of appealability on his substantive competency claim.[16]

3

Walton also argues that Gott was constitutionally ineffective for failing to raise the issue of competency before the state trial court and/or on direct appeal. Walton raised this claim in his state habeas petition and the Virginia Supreme Court held that this claim was procedurally barred under *Anderson*. The district court declined to give effect to the *Anderson* procedural bar[17] and rejected this claim on the merits.

The Sixth Amendment provides in relevant part: "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. The Supreme Court has held that the Sixth Amendment guarantees to all criminal defendants the right to effective assistance of counsel. *Strickland*, 466 U.S. at 686.

In general, claims of ineffective assistance of counsel are covered by the familiar two-part test established in *Strickland*. Under that test, the petitioner first must show that his counsel's performance fell below an objective standard of reasonableness. *Id.* at 687. Second, the petitioner must establish prejudice by showing "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

Walton's claim fails under both prongs of *Strickland*. With respect to the reasonableness of counsel's performance, the record reflects that counsel's performance was more than reasonable. First, following his appointment, Gott, through interviews with Walton and members of Walton's family, obtained extensive background information about Walton, including information Walton provided to Gott in a thirty-

---

[16]Having concluded that Walton has failed to establish the first prong of the *Slack* test, we need not address whether the district court was correct in its procedural bar ruling. *Slack*, 529 U.S. at 484-85.

[17]Of note, before this court, the Commonwealth has waived any reliance on *Anderson* as a ground for dismissal of *any* of Walton's claims.

nine page questionnaire. In the questionnaire, Walton denied any family history of mental illness or that he had ever been diagnosed or received any attention for psychological, mental, or emotional problems. Walton also denied experiencing symptoms of mental or emotional difficulties.

Second, Gott obtained a court-appointed mental health expert and documented information for his expert to consider in assessing Walton's mental health status. Dr. Samenow found that Walton was competent, but expressed concerns to Gott about a "different" Walton in July 1997. In light of this information, Gott investigated and pursued available avenues to obtain additional evaluations. His diligent efforts paid a dividend when the state trial court ordered a competency evaluation.

Third, once a competency evaluation was ordered, Gott provided Dr. Ryans with Dr. Samenow's report, which set out Walton's problematic upbringing and lifestyle and his observations of Walton's conduct that had precipitated the evaluation. The report also alerted Dr. Ryans to the odd behavior which had been observed. After a thorough evaluation of Walton, Dr. Ryans unequivocally opined that Walton was competent to stand trial.

Fourth, despite Walton's behavior in the courtroom during the sentencing phase of the trial, Dr. Samenow never suggested to Gott, let alone to anyone else, that Walton was incompetent. Rather, Dr. Samenow explained that Walton "felt it was everything coming all at once finally, and he was scared." In short, the record leaves no doubt that counsel's performance concerning Walton's competency was more than reasonable.

With respect to the prejudice prong, Walton was not prejudiced by Gott's decision not to raise the issue of Walton's competency. The record in this case indisputably demonstrates that Walton was competent at the time of his guilty pleas and at the sentencing phase of his case and, therefore, was not prejudiced by Gott's decision not to raise the competency issue. Accordingly, "reasonable jurists" could not disagree with the district court's determination that Gott was not constitutionally ineffective for failing to raise the issue of competency before the state trial court. *Slack*, 529 U.S. at 484. Therefore, we deny

Walton's request for a certificate of appealability on his claim that Gott was constitutionally ineffective for failing to raise the issue of competency before the state trial court.

B

Walton also claims that his guilty pleas were not knowing, intelligent, and voluntary. Walton alleged in his state habeas petition not only that his guilty pleas were not knowing, intelligent, and voluntary in light of legal incompetence, but also that they were not knowing, intelligent, and voluntary in light of his mental illness and his delusions about the consequences of a death sentence. The Virginia Supreme Court applied the rule in *Anderson* and refused to consider Walton's claim. Walton alleged again in his federal habeas petition that his guilty pleas were not knowing, intelligent, and voluntary. The district court declined to give effect to the *Anderson* procedural bar and rejected this claim on the merits.

The standard for determining whether a guilty plea is constitutionally valid is whether the guilty plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant. *North Carolina v. Alford*, 400 U.S. 25, 31 (1970). In applying this standard, courts look to the totality of the circumstances surrounding the guilty plea, *id.*, granting the defendant's solemn declaration of guilt a presumption of truthfulness. *Henderson v. Morgan*, 426 U.S. 637, 648 (1976) (plurality opinion).

In this case, the state trial court conducted an extensive colloquy with Walton to ensure that Walton's pleas of guilty were made knowingly, intelligently, and voluntarily. Absent clear and convincing evidence to the contrary, Walton is bound by the representations he made during the plea colloquy. *Fields v. Attorney General of State of Maryland*, 956 F.2d 1290, 1299 (4th Cir. 1992). Walton has presented no evidence of sufficient evidentiary force, *e.g.*, evidence that he was forced, coerced, threatened, or improperly induced into pleading guilty, *Brady v. United States*, 397 U.S. 742, 755 (1970) (holding that a guilty plea is made knowingly and intelligently if the defendant is fully aware of the direct consequences of his guilty plea and was not induced by threats [or promises to discontinue improper harassment], misrepresentation, including unfulfilled or unfulfillable promises, or

by promises that are by their nature improper as having no relationship to the prosecutor's business, *e.g.*, bribes), to demonstrate that his representations were untruthful or involuntary. Walton is, therefore, bound by his representations. *Fields*, 956 F.2d at 1299. Furthermore, Walton's familiarity with the criminal justice system provides further support for the conclusion that he knowingly, intelligently, and voluntarily pled guilty. *Cf. United States v. DeFusco*, 949 F.2d 114, 117 (4th Cir. 1991) (holding that district courts are to be given a wide degree of discretion in deciding the best method to inform and ensure a defendant's understanding of the charges and, to that end, may consider the defendant's personal characteristics). Finally, there is no evidence in the record to suggest that Walton's guilty pleas were rendered involuntary on account of incompetence. Walton's competency was fully explored by Dr. Samenow and Dr. Ryans and these experts never gave any indication that a mental illness or disturbance impeded Walton's ability to knowingly, intelligently, and voluntarily plead guilty. Accordingly, "reasonable jurists" could not disagree with the district court's determination that Walton's guilty pleas were knowing, intelligent, and voluntary. *Slack*, 529 U.S. at 484. Therefore, we deny Walton's request for a certificate of appealability on his claim that his guilty pleas were not knowing, intelligent, and voluntary.

## C

Walton claims that he was denied constitutionally effective assistance of counsel when Gott failed to object to the appointment of Dr. Samenow. Walton presented this claim in his state habeas petition and again in his federal habeas petition. Invoking *Anderson*, the Virginia Supreme Court refused to consider the claim. The district court declined to give effect to the *Anderson* procedural bar and rejected the claim on the merits.

The gist of Walton's argument is that, had Gott objected to the appointment of Dr. Samenow, the state trial court would have appointed another expert, another more qualified expert would have determined that Walton was schizophrenic, and this fact, taken together with other mitigating evidence, would have convinced the state trial court that life without parole was a sufficient and appropriate punishment. The legal authority supporting Walton's argument is

*Ake* and Virginia Code § 19.2-264.3:1. Under *Ake*, a defendant has the right to the assistance of a mental health expert if the defendant makes a showing to the trial court that his mental state is at issue in his defense of the charges or if, in arguing future dangerousness in the sentencing phase, the prosecution uses expert psychiatric testimony. 470 U.S. at 82-83 (noting that the need for the assistance of a psychiatrist is "readily apparent" either when "the defendant is able to make an *ex parte* threshold showing to the trial court that his sanity is likely to be a significant factor in his defense" or "when the State presents psychiatric evidence of the [capital] defendant's future dangerousness" during the sentencing phase). Virginia Code § 19.2-264.3:1 provides the mechanism for extending the services *Ake* may require and also provides that expert assistance is available to assist in the investigation and presentation of mitigating evidence.

According to Dr. Samenow's testimony at the federal evidentiary hearing, "[c]rime resides with the individual, . . . environmental factors can make crime easier or more difficult to commit, [but] the origin of crime is within the individual." Consequently, according to Dr. Samenow, environmental factors do not cause crime, rather what causes crime is how a defendant "choose[s] to deal with whatever life's circumstances are." Furthermore, Dr. Samenow "downplay[s] . . . the existence of mental illness as being something that motivates the defendant." Thus, in Dr. Samenow's opinion, "a defendant, even if he otherwise may be diagnosed as mentally ill, is able to make choices about his conduct."

Because of his professional views, Dr. Samenow understands "why a defense attorney might not think that I was the best person in terms of the search for mitigating factors, given the positions that I've taken through what I have written." Dr. Samenow's novel theory (in that it is not largely accepted by his colleagues) regarding mental illness and criminals led Judge Murnaghan to observe that:

> Dr. Stanton Samenow's professed and public views make him incompetent to aid a defendant in finding and presenting mitigating factors at a defendant's sentencing phase. . . . He has abandoned sociologic, psychologic, and mental illness explanations for criminal behavior and holds the view that most diagnoses of mental illness in criminals

> resulted from the criminal's fabrications. . . . Dr. Samenow's published works state that circumstances have nothing to do with criminal violations and that providing the criminal with an opportunity to present excuses deferred him and us further and further from change. . . . Dr. Samenow's views obviate his ability to evaluate mitigating factors relating to the history or character of a criminal defendant because he is of the opinion that no mitigating factors exist.

*Ramdass v. Angelone*, 187 F.3d 396, 411 n.1 (4th Cir. 1999) (Murnaghan, J., concurring in part and dissenting in part) (internal quotation marks omitted).

At the federal evidentiary hearing, Gott acknowledged that he would not have chosen Dr. Samenow as his expert in the case "if he had his druthers," but he did acknowledge that he had a good working relationship with Dr. Samenow. Gott had read a treatise written by Dr. Samenow and recognized that Dr. Samenow held views which were not, in his (Gott's) opinion, defendant-friendly.

In this case, Walton was not prejudiced by Gott's failure to object to the appointment of Dr. Samenow. To show prejudice, Walton must demonstrate that the state trial court and/or the Virginia Supreme Court "would have either removed Dr. Samenow upon objection or appointed an additional expert upon request." *Ramdass*, 187 F.3d at 410. As in *Ramdass*, Walton cannot meet this standard. First, Walton had no constitutional right to insist on the appointment of any particular expert. *Ake*, 470 U.S. at 83; *Wilson v. Green*, 155 F.3d 396, 401-02 (4th Cir. 1998) (holding that the Constitution does not entitle a criminal defendant to the effective assistance of an expert witness). Second, Dr. Samenow's August 1997 report demonstrates that his conclusions concerning the relationship between mental illness and crime had no effect on his evaluation of Walton. Dr. Samenow's views did not prevent him from thoroughly investigating Walton's background and conducting psychological testing to assist Gott. Moreover, Dr. Samenow's views would not have prevented him from determining whether Walton was schizophrenic. Indeed, Dr. Samenow found no indication, and later refused to conclude, that Walton was mentally ill. This view was never disputed by Dr. Ryans, a psychiatrist who apparently does not share Dr. Samenow's views on the

relationship between mental illness and crime. Finally, evidence concerning Walton's mental illness was not logically consistent with Gott's defense strategy to "portray Walton as a young man who, although he had committed three murders, nevertheless had taken responsibility for his actions by pleading guilty and who, in the relatively recent past, had been such a good young man that upstanding citizens of the community were willing to speak on his behalf despite what he had done." Accordingly, "reasonable jurists" could not disagree with the district court's determination that Walton was not deprived of constitutionally effective assistance of counsel when Gott failed to object to the appointment of Dr. Samenow. *Slack*, 529 U.S. at 484. Therefore, we deny Walton's request for a certificate of appealability on his claim that he was deprived of constitutionally effective assistance of counsel when Gott failed to object to the appointment of Dr. Samenow.

D

Walton also claims that Gott unreasonably failed to investigate and present mitigating mental health evidence. Walton raised this claim on state habeas and in his federal habeas petition. Invoking *Anderson*, the Virginia Supreme Court refused to consider the claim. The district court declined to give effect to the *Anderson* procedural bar and rejected the claim on the merits.

Specifically, Walton asserts that Gott failed to pursue a sentencing strategy to show that Walton was a schizophrenic who could be treated with medication to reduce his dangerousness and that it was his mental illness that accounted for his behavior at sentencing. As noted above, Gott's strategy was to "portray Walton as a young man who, although he had committed three murders, nevertheless had taken responsibility for his actions by pleading guilty and who, in the relatively recent past, had been such a good young man that upstanding citizens of the community were willing to speak on his behalf despite what he had done." In Gott's opinion, this strategy was Walton's best chance for avoiding the death penalty. Gott presented several witnesses, including family and community members, who portrayed Walton in this light. Gott also entered into evidence testimony from one of Walton's former counselors, who testified as to Walton's progress and good behavior during Walton's short stay at

Natural Bridge Juvenile Correctional Center. This latter evidence allowed Gott to argue to the state trial court that Walton responded well "to the treatment that was there offered to him at the time, so much so that his stay was relatively short."

In this case, Walton cannot show that Gott's performance fell below an objective standard of reasonableness. *Strickland*, 466 U.S. at 687. First, through his numerous conversations with Walton and his family members, Gott never received any information pertaining to any family history of mental illness or that Walton suffered from a mental illness. Second, neither Dr. Samenow nor Dr. Ryans suggested that Walton suffered from a mental illness. Third, there were problems with placing Dr. Ryans on the stand because Walton had falsely informed Dr. Ryans that he was not guilty. Fourth, a mental health defense opened up the door to the Commonwealth placing into evidence that Walton had told at least two fellow inmates that he intended to "play crazy." Indeed, Walton, following his July 1997 interviews with Dr. Samenow, told a fellow inmate that he just went to Alexandria for a psychiatric evaluation and "played crazy all weekend." Fifth, Gott was aware that, in March 1997, Walton had stood trial in Danville for burglary and grand larceny committed in September 1996 and that neither his competency to stand trial nor his sanity at the time of the offenses was an issue in that case. Indeed, Gott consulted with Walton's attorney in that case, who informed him that "Walton had done nothing but 'blow smoke,' i.e., lie to him, throughout his representation of Walton." Finally, the only basis for Walton's concrete allegations of mental illness or schizophrenia is found in the expert opinions he obtained after Walton's trial and direct appeal and after the state habeas petition was dismissed. Walton attempted to offer an affidavit from Dr. Ruben Gur (a neuropsychologist) and a neuropsychological report from Dr. Jeffrey Kreutzer (a neurologist) to support his allegations of mental illness. The Virginia Supreme Court granted the Commonwealth's motion to strike these materials because they were presented too late. In the district court, Walton resubmitted these documents, along with a report from Dr. Anand Pandurangi (a psychiatrist), to bolster his claim of mental illness.[18]

---

[18]Drs. Gur and Kreutzer evaluated Walton about two years after the trial and administered a battery of neuropsychological tests, some

Because the Virginia Supreme Court's evidentiary ruling was not so extreme as to result in the denial of a constitutionally fair proceeding, we cannot consider Dr. Gur's affidavit and Dr. Kreutzer's report. *Spencer v. Murray*, 5 F.3d 758, 762 (4th Cir. 1993). Moreover, 28 U.S.C. § 2254(e)(2) obviously bars our consideration of Dr. Pandurangi's report.

In any event, Walton's proffered mental health evidence does not make Gott's tactical decision constitutionally unreasonable. First, Gott was not required to shop for a more favorable expert. *Poyner v. Murray*, 964 F.2d 1404, 1419 (4th Cir. 1992). Second, Gott was entitled to rely on the information he obtained from Dr. Samenow and Dr. Ryans. *Pruett v. Thompson*, 996 F.2d 1560, 1574 (4th Cir. 1993). Third, we have repeatedly acknowledged the deference due to the strategic decisions made by trial counsel. *See, e.g.*, *Truesdale v. Moore*, 142 F.3d 749, 755 (4th Cir. 1998) (reasonable strategic decision to avoid evidence of brain damage which was inconsistent with defense strategy and a double-edged sword); *Bunch v. Thompson*, 949 F.2d 1354, 1363-64 (4th Cir. 1991) (strategic decision to avoid negative psychiatric testimony reasonable). Consequently, even though Gott's chosen sentencing strategy (Walton was a young, remorseful man who was capable of doing well in confinement) had its own pitfalls (Walton's criminal history and recent altercations in the Danville Detention Center), Gott's decision concerning the sentencing strategy was an objectively reasonable one, and, therefore, Walton cannot demonstrate that Gott's representation was constitutionally deficient.[19] Accordingly, "reasonable jurists" could not disagree with the district

---

designed to diagnose schizophrenia. They also interviewed Walton and reviewed his medical, psychological, educational, and legal records. According to these experts, "Percy Walton suffers from severe chronic schizophrenia, probably of a paranoid or disorganized type. . . . The evidence also indicates that Mr. Walton was suffering from schizophrenia at the time of the offense." Dr. Pandurangi confirmed this diagnosis.

[19]We note that Walton's behavior during the sentencing phase of the case made it more difficult for the defense to portray Walton as a young, remorseful man who was capable of doing well in confinement. However, we cannot conclude that Gott's decision to stick with his chosen sentencing strategy renders his performance constitutionally deficient.

court's determination that Gott did not unreasonably fail to investigate and present mitigating mental health evidence. *Slack*, 529 U.S. at 484. Therefore, we deny Walton's request for a certificate of appealability on his claim that Gott unreasonably failed to investigate and present mitigating mental health evidence.[20]

## III

  For the reasons stated herein, we deny Walton's application for a certificate of appealability and dismiss the appeal.[21]

*DISMISSED*

---

[20]Walton also claims that he was deprived of constitutionally effective assistance of counsel on direct appeal. Walton alleged in his state habeas petition and again in his federal habeas petition that Gott was constitutionally ineffective on appeal. The Virginia Supreme Court summarily denied this Sixth Amendment claim on the merits. The district court held that this decision was not contrary to and did not involve an unreasonable application of clearly established federal law. We have reviewed this claim and conclude that "reasonable jurists" could not disagree with the district court's determination that the Virginia Supreme Court's decision on this claim was not contrary to and did not involve an unreasonable application of clearly established federal law. *Slack*, 529 U.S. at 484. Therefore, we deny Walton's request for a certificate of appealability on this claim.

[21]We note that Walton does not, for obvious reasons, press his claim that he is incompetent to be executed, as that claim, at this time, is premature. *Cf. Martinez-Villareal*, 523 U.S. at 644-45 (petitioner's claim that he was incompetent to be executed, raised for the second time after his first claim was dismissed as premature, was not a "second or successive" petition under the AEDPA).